UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

GEORGE LEVY,

Defendant.

**MEMORANDUM AND ORDER**

16-CR-270

**Appearances**

**United States**

**Robert L. Capers**
United States Attorney, E.D.N.Y.
By: **Ian Craig Richardson**
U.S. Attorney's Office, E.D.N.Y.
271 Cadman Plaza East
Brooklyn, NY 11201


**Defendant**

**Mia Eisner-Grynberg**
Federal Defenders of New York
One Pierrepont Plaza
16th floor
Brooklyn, NY 11201

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.   Introduction ........................................................................................................... 1

II.  Facts ...................................................................................................................... 2

   A.   Parties' Versions ............................................................................................ 2

   B.   Facts Found by the Court .............................................................................. 8

III. Motion to Suppress ............................................................................................. 11

   A.   Physical Evidence ........................................................................................ 11

      1.   Vehicle Stop and Search .......................................................................... 11

      2.   Post-Arrest Strip Search .......................................................................... 12

   B.   Post-Arrest Statements ................................................................................ 12

   C.   Law ............................................................................................................... 12

      1.   Search and Seizure under the Fourth Amendment .................................. 12

      2.   Exclusionary Rule .................................................................................... 17

      3.   Standard for Voluntariness of Confessions .............................................. 19

IV.  Application of Law to Facts ............................................................................... 24

   A.   Physical Evidence ........................................................................................ 24

      1.   Firearm ..................................................................................................... 27

      2.   Narcotics .................................................................................................. 32

   B.   Post-Arrest Statements ................................................................................ 32

      1.   Coercion by Threat ................................................................................... 32

      2.   Two-Step Interrogation ............................................................................ 34

      3.   The McNabb-Mallory Rule ...................................................................... 34

V.   Conclusion .......................................................................................................... 36

# I.      Introduction

This case arises during a time in which courts are on the edge of a series of subtle decisions regarding the balance required in encouraging effective police action to protect the public while preventing police abuse; respect by the public for sound police work is essential.

Framing the appropriate symmetry is particularly necessary since New York City's stop-and-frisk policy as a method for seizing illegal weapons has been appropriately limited by case law and changes in police tactics. *See Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013). This case represents a classic illustration of the current tension between police officers who are carrying out their duty to prevent crime and members of communities who may have experienced police misconduct.

In this case the police did their job well in protecting the public against possible crime – and they violated no constitutional right of defendant while doing so. It would be a travesty to permit the criminal here to suppress evidence of his criminality. Despite the police officers' gilding of their observations to make them appear more incriminatory than they were, the unvarnished evidence demonstrates that no right of defendant was violated.

Defendant George Levy moves to suppress (1) physical evidence recovered by officers of the New York City Police Department ("NYPD") following an allegedly unlawful stop and search, and (2) post-arrest statements claimed to have been made under coercion.

He is charged with possessing a firearm after having been previously convicted of one or more crimes punishable by a term of imprisonment exceeding one year, in violation of sections 922(g)(1) and 924(a)(2) of the United States Code, title 18. *See* Indictment, May 18, 2016, ECF No. 9.

The firearm was discovered by NYPD officers after one of them looked into a stopped vehicle. Defendant challenges the lawfulness of that discovery. According to defendant, the look

into the vehicle in which he had been a recent passenger "was not justified by any suspicion of criminal activity." Def.'s Mot. to Suppress, Sept. 1, 2016, ECF No. 19 ("Def's Mot."), at ¶ 9. He moves to suppress the physical evidence recovered from the vehicle and his person: any evidence recovered should be suppressed, he claims, as "a fruit of the poisonous tree." *Id.* at ¶ 10.

Defendant also argues that his post-arrest written and oral statements were unlawfully coerced. *Id.* at ¶¶ 12-16. More than eleven hours passed between his arrest and the oral statement he now moves to suppress. *Id.* He contends that he spoke following unlawful threats that his girlfriend would lose her nursing license and custody of her children if he did not take responsibility for the gun and his admissions. *Id.*

## II.     Facts

The relevant facts are disputed by the parties. The court held a full bench trial on the question of what happened at or near the time of arrest. Set out below are the proposed storylines of the parties and the findings of the court beyond a reasonable doubt.

The parties appeared in person at the suppression hearing on October 5, 13, and 14, 2016. Hr'g Tr., Oct. 14, 2016 ("Hr'g Tr."). Defendant submitted a declaration and testimony in support of his motion. Def.'s Mot. at Ex. A, Sept. 1, 2016, ECF No. 19 ("Levy Decl."). The police submitted testimony in support of their version of what occurred.

### A.     Parties' Versions

According to defendant, on February 4, 2016, at approximately 1:35 a.m., he was sitting in the front passenger seat of his girlfriend's car, a Chrysler Pacifica ("Pacifica"). Levy Decl. at ¶ 2. She was driving. She pulled up and parked the car in front of her apartment building. He opened the front passenger door and exited. He states that the car was legally parked and "was not sticking out into the street in any way." *Id.* at ¶¶ 2-3. His girlfriend, Jessica Beniquez, testified at the evidentiary hearing that she had picked defendant up that evening, they purchased a snack of chips

and soda at a corner store and then she drove herself and defendant to her apartment, where they were planning to spend the night. Hr'g Tr. 295:10-296:15, 328:14-329:12. She testified that she parked the Pacifica, which is registered to herself, "perfectly," approximately four inches from the curb across the street from her apartment building, with "nothing sticking out into the street." *Id.* at 298:6-14; Ct. Ex. 5B, Oct. 14, 2016.

When the officers approached the car, Ms. Beniquez had already turned off the engine; all the windows were closed. Her intention was to park the car for the night. She had begun exiting the car from the driver's door. Hr'g Tr. at 298:20-300:3, 329:18-330:17.

As the officers pulled up, her left leg was already out of the car. At the same time, defendant was exiting the car on the passenger side. *Id.* at 330:20-331:3. When the officers approached, the passenger door was wide open, and defendant was outside of the car, leaning into it to retrieve Ms. Beniquez's purse and the purchases they had just made. *Id.* at 331:5-24.

Defendant testified that at this point he had "one bag of marijuana inside of [his] underwear and one unlit marijuana cigar in [his] pocket." Levy Decl. at ¶ 3. According to his declaration, no "lit or burning marijuana" was present on either his person or in the vehicle. *Id.* Ms. Beniquez testified that neither she nor the defendant had been smoking marijuana in the car during or prior to the officers' arrival; it is a firm principle of hers that "there is no marijuana smoking in [her] car." Hr'g Tr. at 300:14-301:3.

The police provide a different account. They testified that three plainclothes NYPD officers on anti-crime patrol in an unmarked car pulled up next to the vehicle after they observed it "parked with the rear end . . . sticking out into the street and impeding traffic." Gov't Mem. in Opp'n to Def.'s Mot. to Suppress, Sept. 8, 2016, ECF No. 21 ("Gov't Opp'n Mem."), at 2; Hr'g Tr. at 14:1-15:8. The officers' car stopped alongside the car in order to instruct the driver to park

properly. Hr'g Tr. at 15:9-24. Through the open windows of their unmarked car, the officers claimed they smelled marijuana emanating from the Pacifica. Gov't Opp'n Mem. at 2; Hr'g Tr. at 16:9-13. The stopped Pacifica's dome light was on. Within the vehicle, they observed a woman sitting in the driver's seat, just rising to exit. The defendant was standing just outside the wide-open passenger door of the vehicle, leaning into the car. Hr'g Tr. at 15:25-16:8.

The three officers approached the vehicle. Two officers asked defendant's girlfriend for her license and registration, which she promptly provided. Gov't Opp'n Mem. at 2; Hr'g Tr. at 105:12-20. According to the government, "[w]hen the driver of the Pacifica opened the door of her car to hand her license to the officers, [the officers] immediately noticed that the odor of marijuana became much stronger." Gov't Opp'n Mem. at 2.

The two officers took the driver of the vehicle to its rear. The third officer, Officer Taveras, approached defendant, who at that time was "standing outside of the open front passenger door of the Pacifica." *Id.* They indicate that defendant "appeared to be moving something in the car" and "nervously glanced at the officer." *Id.*

According to the police, the officer approaching the passenger door "smelled a strong odor of marijuana." *Id.* He asked defendant whether he was smoking marijuana and whether he had any marijuana on him. *Id.* This officer says that defendant admitted to having a marijuana cigarette, handed it to the officer, and stated that "there might be some marijuana in the Pacifica:"

> The third officer smelled a strong odor of marijuana and asked the defendant if he was smoking marijuana and whether he had marijuana on him. The defendant responded that he had an "L" and handed what appeared to be a marijuana cigarette to the officer. The officer asked the defendant if he had any more marijuana on his person or in the vehicle and the defendant responded that there might be some marijuana in the Pacifica.

*Id.*

Defendant denies telling the officers that there were any drugs or other contraband in the vehicle. Def's. Mot. at ¶ 8. The officers found no smoked marijuana butt in or near the car. Hr'g Tr. at 72:18-20, 73:13-16, 127:8-25, 130:2-3, 231:13-232:7, 346:7-16.

Both defendant and his girlfriend were directed to stand at the rear of the vehicle. Levy Decl. at ¶ 4; Gov't Opp'n Mem. at 2. The police deny defendant's assertion that the officers "began to search the entire vehicle." Levy Decl. at ¶ 4.

The police testified that, after taking defendant to the rear of the vehicle, Officer Taveras walked to the still fully open front passenger door to conduct a search for any marijuana defendant stated may have been in the car. Hr'g Tr. at 23:13-16; Gov't Post-Hr'g Mem. of L. in Opp'n to Def.'s Mot. to Suppress, Oct. 21, 2016, ECF No. 27 ("Gov't Post-Hr'g Opp'n Mem."), at 12.

Officer Taveras testified at the evidentiary hearing that when he walked to the passenger door of the vehicle, he "stood exactly where [defendant had been] standing in the doorway." Hr'g Tr. at 22:13-17. The officer leaned into the car, with his head in the vehicle, his left hand on the passenger side car seat, and his feet outside of the vehicle. Hr'g Tr. at 22:13-23:5; Gov't Post-Hr'g Opp'n Mem. at 3.

From that position, the officer "observed the handle of a chrome-plated .32 caliber Cobra pistol" under the front passenger seat. Gov't Post-Hr'g Opp'n Mem. at 3. Officer Taveras testified at the hearing that when he leaned into the car, he was able to observe the handle of the firearm that was entirely underneath the seat. Hr'g Tr. at 23:1-5, 85:5-11. He recognized the object as a gun because it "was a bright silver," easily distinguishable from the dark color of the floor of the car. *Id.* at 85:8-15.

In order to lean into the car, he did not have to move or manipulate he door or anything in the car. *Id.* at 23:6-12. Even though he observed the firearm by leaning into the car, Officer

Taveras testified that, based on his recollection and pictures of the passenger side door taken at different angles, an observer would have been able to see the gun in the car from the vantage point of where defendant's – and later Officer Taveras's – feet were placed outside of the car. *Id.* at 83:17-84:16; Gov't Post-Hr'g Opp'n Mem. at 10.

Officer Figueroa, who was speaking to defendant and Ms. Beniquez at the back of the Pacifica at this point, testified that after defendant's arrest, Officer Taveras showed him where the gun was located in the car, and Officer Figueroa was able to see the gun by standing outside the car near the open door of the passenger side of the car. Hr'g Tr. at 196:12-198:9.

Defendant admits he had hidden a .32 caliber Cobra firearm under the front passenger seat of the car. Levy Decl. at ¶ 5. But, he states that the gun was "entirely hidden under the seat and the front passenger floor mat. No part of the firearm was visible from the outside of the vehicle." *Id.* Ms. Beniquez testified that she was unaware that defendant had a gun in the car. Hr'g Tr. at 317:19-318:3.

After Officer Taveras observed the gun, defendant and his girlfriend were placed under arrest and taken to the precinct house. The arrest was reported by the officers over the police radio at approximately 1:40 a.m. Gov't Opp'n Mem. at 2-3; *see also* Def.'s Mot. at ¶ 10.

After reviewing and signing a *Miranda* waiver form at the precinct, defendant was strip-searched. A small quantity of marijuana and crack cocaine were found on his person. Def.'s Mot. at ¶ 10.

Following the search of defendant, and while he was at the police precinct, NYPD officers learned that a warrant was pending for his arrest from the Northern District of New York, for a violation of supervised release. *Id.* at ¶ 11.

Defendant states that, while at the police precinct, he and his girlfriend were coerced into making written statements. He claims that officers told him that if he did not take responsibility for the gun, they would call the Administration for Children's Services ("ACS") and seek removal of Ms. Beniquez's children from her custody. Def.'s Mot. at ¶ 12. Alleged is that they also "threatened that his girlfriend would lose her nursing license." *Id.*

The government contends that the police made no such threats; defendant had stated that he wanted to reconcile with his girlfriend and not cause her any problems, which is why he took responsibility for the gun. Gov't Opp'n Mem. at 3.

Defendant and his girlfriend allegedly "expressed various concerns to the officers about the consequences the defendant's girlfriend might suffer if she was convicted of an offense relating to the criminal possession of a firearm." *Id.* at 12. The officers told defendant to truthfully indicate in the written statement whether the gun was his. Hr'g Tr. at 247:14-22.

At 2:15 a.m., after receiving full *Miranda* warnings, defendant provided a written statement. *Id.* at 204:3-25; *see generally* Ct. Ex. 2. Defendant claims that he did so "[f]eeling that he had no other choice." Def.'s Mot. at ¶ 12; Levy Decl. at ¶ 7.

Ms. Beniquez provided a written statement at about the same time indicating that she had no knowledge of the weapon. She was then released from custody. Gov't Opp'n Mem. at 4; *see generally* Ct. Ex. 2.

There is a dispute as to whether defendant and his girlfriend were interviewed in the same room and had an opportunity to discuss what they would write in their statements. Ms. Beniquez testified that she was taken to the room where defendant was already being held; there an officer informed her that defendant had already written a statement, and that she "had to write a statement or else [she was told] . . . [they] both can get into trouble and [she] ha[s] a career and [she] ha[s]

children and [she] need[s] to think about that." Hr'g Tr. at 305:2-307:11. Contrary to her testimony, Officer Taveras and Officer Figueroa each testified that defendant and Ms. Beniquez were never in the same room from the time they arrived at the precinct, so they had no opportunity to discuss what they would write in their statements. *Id.* at 91:3-12, 207:6-10.

At 12:51 p.m. later that day, more than eleven hours after his arrest, defendant was questioned again by officers at the precinct. Def.'s Mot at ¶ 14; Levy Decl. at ¶ 7. He was again read his full *Miranda* rights. Following his explicit valid waiver of his right to remain silent, he gave a confession that was recorded on video. Gov't Opp'n Mem. at 4; Hr'g Tr. 168:5-7. Defendant argues that this statement must also be suppressed, because it was obtained after he was coerced into making a statement. Def.'s Mot at ¶ 15.

### B.     Facts Found by the Court

Based on the evidence at the suppression hearing held on October 5, 13, and 14, 2016, the court makes several findings of fact. *See* Hr'g Tr. They support its decision not to suppress the physical evidence and statements. The evidence is clear and convincing and can be characterized as establishing the facts beyond a reasonable doubt.

First, defendant and his girlfriend had not been smoking marijuana.

The government maintains that the officers approached the car and detained the driver and passenger because the car was parked at an angle and impeding traffic, and when the officers instructed the driver to park the car properly, they detected a strong smell of marijuana emanating from the car. *See* Gov't Post-Hr'g Mem. at 2. Defendant stated and Ms. Beniquez testified that neither of them had been smoking marijuana prior to the officers' arrival. Levy Decl. at ¶ 3; Hr'g Tr. at 300:14-301:3. Ms. Beniquez testified that she does not tolerate smoking marijuana in her car, and that defendant was aware of this rule. She explained that she does not like the smell of marijuana, and because defendant knows this, he "would not even smoke [marijuana] around me."

Hr'g Tr. 331:25-332:6. None of the officers observed smoke at the scene, and they did not find any remnants or marijuana cigarette butts at the scene. *Id.* at 72:18-20, 73:13-16, 127:8-25, 130:2-3, 231:13-232:7, 346:7-16.

The conclusion is clear: neither defendant nor Ms. Beniquez had been smoking marijuana prior to the officers' arrival. Neither Sergeant Cahill nor Officer Figueroa saw Officer Taveras seizing a marijuana cigarette from defendant on the scene. Their testimony, the NYPD arrest report, and the sworn state court complaint all show that the marijuana found on defendant, including the cigarette, were discovered and seized at the precinct house after the arrest. *Id.* at 130:11-133:24, 234:7-235:17.

Second, the Pacifica was not parked improperly and was not impeding traffic.

Ms. Beniquez credibly testified that she properly parked her vehicle. She is an experienced driver who was intending to return to her home for the night when she parked across the street from her apartment. *Id.* at 313:9-314:6, 329:3-331:24. She turned off the ignition, made certain that the windows of the car were closed, and commenced exiting the car with her left leg outside the car. *Id.* Before exiting, she parked parallel to the curb and in line with the vehicle in front of her. *Id.* at 298:6-299:6. It is unlikely that an experienced driver would have parked at an angle impeding traffic, in a spot she regularly parks in across the street from her home, exiting her car intending to leave it parked improperly for the rest of the night, where it might be hit by a passing vehicle. The photographs and testimony show the police lied about this point to create a reason for the arrest – a legal reason they already had.

Third, the firearm found in the Pacifica was located underneath the front passenger side seat, but was in a position that made it visible to someone standing outside the open door of the front passenger side.

Officer Taveras testified that he placed his head and hand inside of the Pacifica, and first observed the silver handle of the firearm underneath the passenger seat from that vantage point. Hr'g Tr. at 22:15-23:5. He also credibly testified that the pistol would have been visible from the perspective of someone standing in the open car door, as had been defendant. Hr'g Tr. at 83:17-85:2.

Fourth, the firearm was discovered through Officer Taveras's partial intrusion of his head and hand into the car, but was also visible to anyone standing outside the car in the open door of the front passenger side of the car.

The physical facts and testimony confirm this finding.

Fifth, all the narcotics recovered from defendant were found at the precinct, and not on the scene.

Officer Taveras avers that he only placed his head into the car to determine whether it contained marijuana, since defendant had handed him a marijuana cigarette and indicated that there might be more marijuana in the car. Hr'g Tr. at 20:15-22:18; Gov't Post-Hr'g Opp'n Mem. at 2-3. The court does not accept the government's argument that defendant voluntarily handed Officer Taveras a marijuana cigarette and indicated that there could be more marijuana in the car.

Sixth, neither defendant nor Ms. Beniquez had been smoking during or shortly prior to the officers' arrival.

It is highly unlikely that Officer Taveras asked defendant whether he had been smoking and that defendant then voluntarily turned over contraband. The narcotics were found on defendant's person when he was searched at the precinct, following his arrest.

### III. Motion to Suppress

#### A. Physical Evidence

Defendant moves to suppress the following physical evidence: one firearm, ammunition, marijuana, and crack cocaine, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) and the Fourth Amendment of the United States Constitution. *See* Def.'s Mot. He argues that the firearm was the product of an "unwarranted stop" of the vehicle in which he was riding, and that the narcotics recovered from his person at the police station are suppressible as fruit of the poisonous tree.

##### 1. Vehicle Stop and Search

According to defendant, the interaction between the NYPD officers, defendant, and his girlfriend amounted to an "unwarranted stop," which "was not justified by any suspicion of criminal activity." Def.'s Mot. at ¶ 9. He argues that: (1) the vehicle was "parallel parked properly by the curb, was not sticking out into the street, and was not impeding traffic in any way;" (2) neither defendant nor his girlfriend "were smoking or had been smoking marijuana, and none was in plain view of the officers;" (3) neither defendant nor his girlfriend "told the police that there was any drugs or contraband in the vehicle," nor did they give consent to search the vehicle; and (4) the gun recovered by the officers "was not visible from outside of the car." Def.'s Mot. at ¶¶ 5-6, 8; *see generally* Def.'s Post-Hr'g Mem. in Support of Def.'s Mot. to Suppress, Oct. 28, 2016, ECF No. 29 ("Def.'s Post-Hr'g Mem.").

The government counters that (1) defendant's initial encounter with the police was consensual; (2) even if the encounter amounted to a seizure, it was justified by reasonable suspicion; (3) the firearm was in plain view; and (4) even if the firearm was not in plain view, the search conducted by the officers was supported by probable cause. *See generally* Gov't Opp'n Mem.; Gov't Post-Hr'g Opp'n Mem.

### 2. Post-Arrest Strip Search

Defendant argues that his person would not have been searched "but for the unlawful car stop." Def.'s Mot. at ¶ 10. The drug evidence should therefore be suppressed, he argues, as fruit of the poisonous tree. *Id.*

### B. Post-Arrest Statements

Defendant moves to suppress any statements made by him to government agents on or about February 4, 2016, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), section 3501 of the United States Code, title 18, and the Fourth and Fifth Amendments of the United States Constitution. *See* Def.'s Mot.

He argues that his written statement was coerced by the officers' threats that, unless he took responsibility for the gun, they would contact ACS and seek to take custody of the children away from Ms. Beniquez as well as contact the New York state licensing board to remove her nursing license. *Id.* at ¶ 12. According to defendant, his subsequent oral statement to the police was "tainted by the coercion that elicited his initial written statement." *Id.* at ¶ 14. This, he contends, was part of the police's "deliberate two-step" process to deprive him of his Fifth Amendment right. *Id.*

Defendant argues that his oral statement must be suppressed because it was made subject to questioning that occurred over six hours after the arrest, in violation of section 3501(c) of the United States Code, title 18. *Id.* at ¶ 16. This federal statute applies even though he was in state custody, he argues, because local authorities were acting in collusion as part of a "working arrangement." *Id.* at ¶ 17.

### C. Law

### 1. Search and Seizure under the Fourth Amendment

The Fourth Amendment incorporates the rule that a citizen should be free from unreasonable, unnecessary intrusions on his privacy. U.S. Const. amend. IV. "Fourth Amendment seizures are reasonable only if based on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013) (internal quotation marks and citations omitted). "Within the framework of these fundamental rules there is some latitude for police to detain where the intrusion on the citizen's privacy [is] so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety could support the seizure as reasonable." *Id.* (internal quotation marks and citations omitted).

There are three general types of interactions between agents of the government and private citizens in the present context: consensual encounters, investigative detentions, and arrests. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995).

"Consensual encounters require no justification so long as the police do not convey a message that compliance with their requests is required." *Id.* (internal quotation marks and citation omitted).

Seizures must be differentiated from consensual encounters: "a seizure does not occur simply because a police officer approaches an individual and asks a few questions. . . . Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (internal quotation marks and citation omitted). Factors that might indicate a seizure has occurred include:

> [T]he threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane

> tickets or identification; and a request by the officer to accompany
> him to the police station or a police room.

*United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (internal citations omitted).

Arrests and warrantless searches require a showing of probable cause. U.S. Const. amend. IV. Probable cause entails "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted).

Under the automobile exception to warrantless searches, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains . . . evidence of a crime. This exception is justified in the ground that a person has a lesser expectation of privacy in a vehicle than in his or her home." *United States v. Tribble*, No. 07-CV-232, 2007 WL 1876500, at *2 (E.D.N.Y. June 28, 2007) (internal quotation marks and citations omitted).

Once a defendant has been arrested on probable cause, the search incident to arrest requires no additional probable cause. *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.").

A brief investigative detention, or *Terry* stop, may involve an investigation of an individual and his or her containers. *Glover*, 957 F.2d at 1008. It constitutes a seizure under the Fourth Amendment and intrudes upon a citizen's privacy beyond the scope of a consensual encounter but does not amount to an arrest. *Terry v. Ohio*, 392 U.S. 1 (1968); *see also Adams v. Williams,* 407 U.S. 143, 145 (1972). "A *Terry* stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007). *Terry* stops do not require

probable cause, but, rather, reasonable suspicion that criminal activity has occurred or is about to occur. *Tehrani*, 49 F.3d at 58; *Glover*, 957 F.2d at 1008.

Reasonable suspicion exists when a police officer can "point to specific and articulable facts which, taken together with rational inferences from those facts," provide a "reasonable basis" that the person to be detained is committing or has committed a criminal offense. *Terry*, 392 U.S. at 21; *United States v. Bailey*, 743 F.3d 322, 331-32 (2d Cir.), *cert. denied*, 135 S. Ct. 705 (2014). It requires more than an "inchoate and unparticularized suspicion or hunch." *United States v. Irizarry*, 509 F. Supp. 2d 198, 208 (E.D.N.Y. 2007); *see also United States v. Paulino*, 850 F.2d 93, 94, 98 (2d Cir. 1988) (defendant's furtive movement of "moving his torso and bending over as if placing an object on the floor" gave rise to reasonable suspicion).

The burden is on the state to prove that the scope and duration of a *Terry* stop was closely tailored to the purpose of the investigative detention:

> [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the *least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time*. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Florida v. Royer*, 460 U.S. 491, 500 (1983) (emphasis added) (internal citations omitted).

An investigative detention may become an unlawful arrest if the duration of the stop and the methods employed by law enforcement are more intrusive than the circumstances reasonably warrant:

> A permissible investigative stop may become an unlawful arrest if the means of detention are more intrusive than necessary. We look to the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being

15

armed, and the physical treatment of the suspect, including
whether handcuffs were used.

*Tehrani*, 49 F.3d at 61 (internal quotation marks and citations omitted).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967) (footnote omitted). One of those exceptions is that when an arrest is made, it is reasonable for the arresting officer to conduct a search of the arrestee's person and the area within his immediate control, meaning an "area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California,* 395 U.S. 752, 763 (1969). Such a search may only be carried out if "it is reasonable to believe that the arrestee might access the vehicle at the time of the search or that the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 343 (2009).

The same reasonableness exception applies when no arrest has been made, but "a suspect is stopped in a car," at which point the police may also perform a limited search of the passenger compartment of the car if they reasonably believe that the suspect "is dangerous and may gain immediate control of a weapon." *Elmore*, 482 F.3d at 178 (citing *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983)).

The Supreme Court has confirmed that police may perform a search of a car incident to a lawful *Terry* stop if they have reasonable suspicion that a suspect may gain control of a weapon:

> During any investigative detention, the suspect is in the control of the officers in the sense that he may be briefly detained against his will. . . . Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect [being detained outside of his car] break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not

placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. Or . . . the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons. In any event, we stress that a *Terry* investigation . . . involves a police investigation at close range when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger. . . . In such circumstances, we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.

*Long*, 463 U.S. at 1051-52 (internal quotation marks and citations omitted) (emphasis in original). *See also Adams*, 407 U.S. at 146 ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.") (footnote omitted).

In determining whether an officer had reasonable suspicion to justify a *Terry* stop, the court "must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene." *Bailey*, 743 F.3d at 332 (internal quotation marks and citation omitted). The standard for reasonable suspicion is not high: "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Elmore*, 482 F.3d at 179 (internal quotation marks and citation omitted).

The burden is on the defendant to show that the search was conducted without a warrant. The burden then shifts to the government to show by a preponderance of the evidence that the police had either reasonable suspicion or probable cause to justify their actions. *United States v. Levasseur*, 618 F. Supp. 1390, 1392 (E.D.N.Y. 1985).

## 2.    Exclusionary Rule

The "exclusionary rule" is the primary means for deterring violations of the Fourth Amendment. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). When it applies, the exclusionary rule

excludes from evidence both (i) "primary evidence" obtained as a direct result of an illegal search or seizure; and (ii) evidence later discovered and found to derive from an unlawful search or seizure, the so-called "fruit of the poisonous tree." *Id.*

"[T]he exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *Herring v. United States*, 555 U.S. 135, 141 (2009) (internal quotation marks and citations omitted). The rule is applicable only when "its deterrence benefits outweigh its substantial social costs. Suppression of evidence . . . has always been our last resort, not our first impulse." *Strieff*, 136 S. Ct. at 2061 (internal quotation marks and citations omitted). In light of the exclusionary rule's underlying purpose to deter Fourth Amendment violations, "an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus of applying the exclusionary rule. . . . [E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring*, 555 U.S. at 144 (internal quotation marks and citation omitted). "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*

There are several exceptions to the exclusionary rule; they involve the causal relationship between an unconstitutional act and the discovery of evidence. One such exception is the inevitable discovery doctrine, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Strieff*, 136 S. Ct. at 2061; *United States v. Heath,* 455 F.3d 52, 55 (2d Cir. 2006). "The government bears the burden of proving inevitable discovery by a preponderance of the evidence." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (citing *Nix v. Williams,* 467 U.S. 431, 444 (1984); *United States v. Cabassa,* 62 F.3d 470, 472–73 (2d Cir. 1995)). "[P]roof of inevitable discovery involves no speculative elements

but focuses on *demonstrated historical facts capable of ready verification or impeachment*." *Stokes*, 733 F.3d at 444 (internal quotation marks and citations omitted) (emphasis in original). The inquiry "turns on a central question: Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation? If the answer is 'yes,' the evidence seized will not be excluded." *Heath*, 455 F.3d at 55.

Another exception to the exclusionary rule is the plain view doctrine, under which "police officers, at least under certain circumstances, may seize contraband detected during the lawful execution of a *Terry* search." *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). The seizure of evidence is legitimate if (1) the police officer lawfully made an "initial intrusion" or was otherwise properly in a position from which he could view a particular area; (2) the officer discovered incriminating evidence "inadvertently," meaning he could not know the location of certain evidence in advance and rely on the plain view doctrine only as a pretext; and (3) it was "immediately apparent" to the officer that the items he observed may be evidence of a crime, contraband, or otherwise subject to seizure. *Texas v. Brown*, 460 U.S. 730, 737 (1983); *Dickerson*, 508 U.S. at 375.

The Supreme Court has cautioned that "it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure." *Horton v. California*, 496 U.S. 128, 134 (1990) (emphasis in original) (citing *Coolidge*, 403 U.S. at 465).

### 3. Standard for Voluntariness of Confessions

Determining whether a confession is inadmissible because it was not voluntary is governed by the Fifth Amendment, under which no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he constitutional inquiry is . . . whether the

confession was free and voluntary; that is, [it] must not be exacted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (internal quotation marks omitted) (citing *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). An accused's confession cannot be admitted if it was obtained by "techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (internal quotation marks and citation omitted). The voluntariness of a confession must be established by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

"No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). In applying the totality of the circumstances test, "those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* at 901-2. Relevant characteristics of the accused are the individual's experience and background, age, and lack of education or intelligence. *Id.* at 902.

Relevant conditions of interrogation are the place where the interrogation was held, the length of detention, and the presence or absence of counsel. *Id.* Relevant police officer conduct includes repetitive and prolonged questioning, physical mistreatment, physical deprivation, or any psychologically coercive techniques, including promises of leniency or other benefits. *Id.*

### a) Coercion by Threat

Whether an admission was obtained impermissibly through coercion is a question of fact. "[T]hat the police lie to a suspect to elicit his confession does not necessarily render it involuntary." *Santiago Ortiz v. Kelly*, 687 F. Supp. 64, 65 (E.D.N.Y. 1988). "The mere fact that [the law enforcement official] told [the accused], if both he and his wife were incarcerated, then his children would have to be turned over to a responsible adult or Administration for Children's Services, does not constitute coercion." *United States v. Garcia*, No. 09-CR-330, 2011 WL 6010296, at *5 (E.D.N.Y. 2011); *see also United States v. Barro*, No. 12-CR-160, 2013 WL 3992405, at *8 (E.D.N.Y. 2013) (finding that an officer's statement of fact that he would call Child Protective Services if both the defendant and his wife were arrested is not coercive).

In determining whether a confession was voluntary or coerced, courts look to the totality of the circumstances. *Green*, 850 F.2d at 901. *See Lynumn v. Illinois*, 372 U.S. 528, 534 (1961) (accused's confession held inadmissible when the accused, at the time of the confession, (1) was told that financial aid for her children would be cut off and her children would be taken from her if she did not cooperate; (2) had no previous experience in the criminal law system; and (3) was surrounded by three police officers and a twice convicted felon); *see also Rogers v. Richmond*, 365 U.S. 534 (1961) (finding when a prisoner confessed under threat that his wife would otherwise be taken in for questioning to constitute coercion); *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003) ("[T]hreats to arrest members of a suspect's family may cause a confession to be involuntary.").

### b) Two-Step Interrogation

When a prior statement was coerced and is therefore inadmissible, a second confession may also be inadmissible if the defendant was subjected to a coercive two-step interrogation

procedure.  *Miranda v. Arizona*, 384 U.S. 436, 476 (1966); *see also United States v. Anderson*, 929 F.2d 96, 102 (2d Cir. 1991) ("[T]he use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second one, even if the latter was obtained after properly administered *Miranda* warnings.").

The court first determines if the initial statement, though voluntary, was obtained in violation of the defendant's *Miranda* rights: if not, no violation has occurred.  But if the initial statement *was* obtained in violation of the defendant's *Miranda* rights, the government must demonstrate "by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine the defendant's *Miranda* rights."  *United States v. Moore*, 670 F.3d 222, 229-30 (2d Cir. 2012) (emphasis in original).  If the government is able to meet this standard, "the defendant's post-warning statement is admissible so long as it, too, was voluntary;" if it was not voluntary, "the post-warning statement must be suppressed unless curative measures (designed to ensure that a reasonable person in the defendant's position would understand the import and effect of the *Miranda* warnings and waiver) were taken before the defendant's post-warning statement."  *Id.* at 230.

"When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession."  *Elstad*, 470 U.S. at 310.  A presumption of compulsion may apply when no significant time has elapsed between confessions and no effort was made to dispel the original threat that invalidated the first confession.  *Anderson*, 929 F.2d at 102.

Whether the government applied a coercive two-step process designed to deprive the defendant of his *Miranda* rights is determined by "the totality of the objective and subjective evidence surrounding the interrogations, guided by—but not limited to—the factors identified by the plurality in *Seibert*." *Moore*, 670 F.3d at 230 (internal quotation marks and citation omitted); *see also United States v. Capers*, 627 F.3d 470, 483-84 (2d Cir. 2010).  The *Seibert* factors consist of:

> (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and second interrogation, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*Capers,* 627 F.3d at 475 (citing *Missouri v. Seibert*, 542 U.S. 600, 615 (2004)).

### c)        The McNabb-Mallory Rule

"A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."  Fed. R. Crim. P. 5(a)(1)(A).  In order to enforce the congressional requirement of prompt arraignment, the courts have deemed it necessary to exclude confessions that occur during an unnecessary or unreasonable delay in presentment. *Mallory v. United States*, 354 U.S. 449, 453 (1957).  A "safe harbor" under section 3501(c) of the United States Code, title 18 prevents suppression based on unreasonable delay if the confession was made six hours immediately following arrest: "[i]f the confession was made outside that six-hour period, 'the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.'"  *United States v. Gonzalez*, 764 F.3d 159, 167 (2d Cir. 2014) (citing *Corley v. United States*, 556 U.S. 303, 322

(2009)); *see also McNabb v. United States*, 318 U.S. 332, 333 (1943) (suppressing statement made after delayed interrogation).

Where the accused was under arrest for state charges at the time of the confession, the terms of section 3501(c) of the United States Code, title 18 do not "come into play" until the accused was arrested by agents on a federal charge. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 359 (1994). This rule is, however, complicated "if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment." *Id.* In such a case, "a confession obtained during such a period of detention must be suppressed if the defendant could demonstrate the existence of improper collaboration between federal and state or local officers." *Id.* (citing *Anderson, v. United States*, 318 U.S. 350 (1943)).

IV.    **Application of Law to Facts**

   A.    **Physical Evidence**

Defendant argues that the physical evidence obtained during the search of his girlfriend's car and his own person – including a firearm, ammunition, marijuana, and crack cocaine – must be suppressed because it was found during an illegal search and seizure. Def.'s Mot. at ¶ 9; Def.'s Post-Hr'g Mem. at 7.

As detailed in *supra*, section II.B, the court finds that the encounter between defendant and the police officers was not a consensual encounter, but a seizure. Defendant was approached by three plainclothes officers in an unmarked car. Gov't Opp'n Mem. at 2; Hr'g Tr. 13:9-21. They asked to see the driver's license and registration and instructed the driver to get out of the car. Officer Taveras walked around the car to the passenger side and eventually instructed defendant to stand at the rear of the vehicle. Gov't Mem. at 2; Def.'s Mot. at ¶ 7; Hr'g Tr. at 22:4-12.

These instructions, the location of the officers' car immediately next to the Pacifica, and the presence of multiple officers whose guns and badges were visible despite their plainclothes, conveyed the message that compliance with the officers' requests was required. *Tehrani*, 49 F.3d at 58; *Glover*, 957 F.2d at 1008. A reasonable person in defendant's position, in view of all the circumstances surrounding the encounter, would not have believed that he was free to leave. *Id.* The encounter therefore constitutes a seizure, in connection with an arrest, for which the officers must have had reasonable suspicion that criminal activity had occurred or was about to occur. *Id.*; *Tehrani*, 49 F.3d at 58.

For the seizure to be legal, the officers must have had reasonable suspicion to approach and detain defendant and the driver.

The evidence demonstrates that the officers had sufficient reasonable suspicion to warrant seizure of defendant and his girlfriend, *but* not on the grounds offered by the police testimony about illegal parking and marijuana odor.

The government maintains that the officers had reasonable suspicion to approach the car and detain the driver and passenger within it because the car was parked at an angle and impeding traffic, and when the officers approached the driver to instruct her to park the car properly, they detected a strong smell of marijuana. *See* Gov't Post-Hr'g Mem. at 2.

As explained in *supra*, section II.B, the court finds that the car was parked properly and was not impeding traffic and that neither defendant nor Ms. Beniquez had not been smoking marijuana in the car at any time prior to the officers' arrival.

These findings lead to the inevitable conclusion that the officers did not approach the Pacifica because it was improperly parked or because they detected the smell of marijuana. These

"reasons," the court finds, are part of the officers' attempt to justify why they approached and detained defendant and his girlfriend – a justification they did not need.

The officers were embroidering the truth. They had sufficient reasonable suspicion to approach the car and detain defendant and his girlfriend without fabricating the smell of marijuana and a parking violation.

The officers testified that they were conducting anti-crime patrol on the evening of defendant's arrest. Hr'g Tr. at 11:22-13:8, 188:24-189:2. They were assigned to the 73rd precinct, which includes Brownsville, a high crime area. *Id.* at 11:17-21, 187:14-19. When the officers approached the intersection where the Pacifica was parked, they observed a female drivers, whose left leg was visible as she was emerging from the parked vehicle. *Id.* at 330:20-331:3. On the passenger side, a male – previously unknown to them – was standing in the front passenger side, the door to which was wide open. The male was leaning into the car. Because the dome light was on, the officers were able to observe that the male passenger appeared to be moving something in the car. *Id.* at 16:2-19:3; Gov't Opp'n Mem. at 2.

Ms. Beniquez testified that defendant had been retrieving her purse and the bag from the corner store containing their purchases, which is likely the movement the officers observed when they approached. *Id.* at 331:2-24.

But the officers could not know of this innocent explanation. The officers would not have been able to see from a distance what defendant was moving. From their vantage point, early in the morning they observed a female emerging from a car that an unknown male was leaning into.

It was reasonable for police officers who were on patrol in the middle of the night in a high-crime area to investigate this situation. From their perspective, it would have been reasonable

to conclude that the driver might be in danger and attempting to flee from the car that a stranger was leaning into. Certainly this situation warranted an investigation.

The officers were performing ordinary police work when they approached the car to determine whether any criminal activity was underway. *Id.* at 346:21-347:18. They did their work well.

Taken together, the facts provide a reasonable, particularized suspicion of criminal activity sufficient for the officers to have approached defendant and conducted a brief investigatory detention. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that a high-crime neighborhood is by itself insufficient to justify a *Terry* stop, but "the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a *Terry* analysis.") (internal quotation marks and citation omitted). The scene the officers observed indicates that they had more than an "unparticularized suspicion or hunch" that defendant was committing or had committed a criminal offense when they approached the car. *Irizarry*, 509 F. Supp. 2d at 208.

### 1. Firearm

Officer Taveras leaning his head into the car and placing his left hand on the passenger seat constituted a warrantless – but not unreasonable – search. *See United States v. Montes-Ramos*, 347 F. App'x 383, 388-390 (10th Cir. 2009) (deputy sheriff found to have conducted a search when he leaned his head approximately two inches inside car window and sniffed); *United States v. Ryles*, 988 F.2d 13, 15-16 (5th Cir. 1993) (trooper placing his head inside the open window of a car constituted a search); *People v. Hernandez*, 656 N.Y.S.2d 12, 13-14 (N.Y. App. Div. 1997) (officer "plac[ing] his right hand on the driver's side floorboard" of a car through the driver's side door, which had been left open, constituted a search); *People v. Chapman*, 621 N.Y.S.2d 568, 569 (N.Y. App. Div. 1995) (when officer "leaned into" instead of "merely peer[ed]" into a car, it

constituted a search); *People v. Aquino*, 500 N.Y.S.2d 677, 678–79 (N.Y. App. Div. 1986) (when officer "bent over and stuck his head into the car, to look at the floor," he performed a search).

Officer Taveras's action constituted a reasonable search under the circumstances. It is not the trespass that triggers an unreasonable search, rather the "ultimate focus of the Fourth Amendment analysis remains whether the defendant had a reasonable expectation of privacy in the place searched." *United States v. Fields*, 113 F.3d 313, 322 (2d Cir. 1997) (citing *Katz*, 389 U.S. at 360 (Harlan, J., concurring)). The Fourth Amendment only prohibits unreasonable searches and seizures, the inquiry of which is driven by a "balancing of 'the nature and quality of the intrusion on the defendant's Fourth Amendment interests against the governmental interests alleged to justify the intrusion.'" *See New York v. Class*, 475 U.S. 106, 118 (1986) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The intrusiveness of the search is measured by the expectation of privacy that society is prepared to recognize as reasonable. *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

Defendant's expectation of privacy was significantly diminished as a former passenger in a car on a public street. The officers were justified in determining whether defendant posed a danger by performing a limited search. *Long*, 463 U.S. at 1049 (1983) ("[P]rotection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect.").

Reasonable suspicion that a suspect is armed can support the limited search of a car:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the

officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* (quoting *Terry,* 392 U.S., at 21).  The court in *Terry* determined that a search must meet two requirements in order to fall within this "narrowly drawn authority:"

> *First*, it cannot be motivated solely by a hunch that an individual is armed and dangerous.  *There must instead be a suspicion supported by specific reasonable inferences* which the officer is entitled to draw from the facts in light of his experience.  *Second, the weapons search must be confined in scope* to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

*United States v. Casado,* 303 F.3d 440, 444 (2d Cir. 2002) (emphasis added) (internal quotation marks and citations removed) (quoting *Terry,* 392 U.S. at 27).

When the officers arrived on the scene, they had reasonable suspicion supporting performance of a limited protective search to determine if defendant was armed and if the driver had been threatened by a weapon.  *Terry* case law requires a fact-specific inquiry into whether the search was reasonable under the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene."  *Bailey,* 743 F.3d at 332; *see also Casado,* 303 F.3d at 445 (2d Cir. 2002) ("Because 'no judicial opinion can comprehend the protean variety of the street encounter,' [we can] 'only judge the facts of the case before [us].'" (quoting *Terry,* 392 U.S. at 15)); *United States v. Hussain*, No. 14-4425-CR, 2016 WL 4536516, at *4 (2d Cir. Aug. 31, 2016) ("Fundamentally, then, we consider whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.") (internal quotation marks and citation omitted); *Whren v. United States,* 517 U.S. 806, 813 (1996) (explaining that "the constitutional reasonableness of traffic stops" does not depend "on the actual motivations of the individual officers involved," but instead on objective reasonableness).

In the instant case, the officers observed a car on a public road at 1:40 a.m. in a high-crime neighborhood, with a woman exiting the car while a man was leaning into it, apparently moving an object on the floor of the car. It was reasonable under the circumstances for the officers to investigate whether defendant posed any danger to the driver or themselves. The officers had a clear interest in taking safety precautions.

Officer Taveras performed a limited search; he only leaned his head into the car and placed his hand on the passenger seat to get a better view from the open car door, placing himself in the same position in which he saw defendant when he first approached the wide open front passenger side door.

Officer Taveras did not move any papers or open any compartments before he discovered the firearm. His extremely limited search was reasonable. It was focused on a mere cursory scan of the car's interior so as to assess whether there were any weapons and was no more intrusive than necessary. *United States v. Hernandez*, 63 F. App'x 6, 11 (2d Cir. 2003) ("[W]e find that [the officer's] minimally intrusive visual search of the floor of the front passenger seat through an opened car door, which he conducted to ensure that there was no weapon inside the car, was justified by his reasonable suspicion that criminal activity was afoot."); *Paulino*, 850 F.2d at 94-97 (finding defendant who had been the backseat passenger of a car which had been stopped in a high-crime area had no reasonable expectation of privacy in the area under the floor mat of the car after officer observed defendant's "furtive movement that might signal the presence of a weapon" and performed a protective search).

There was no reason to expect that after the two occupants were moved to the back of the car that anyone could reach for a gun in the car. But that fact did not preclude a preliminary look.

Even if the search was not constitutionally permissible, the gun was visible in plain view. As explained in *supra*, section II.B, Officer Taveras first observed the silver handle of the firearm underneath the passenger seat by placing his head and hand inside of the Pacifica, but the gun was also visible from the vantage point of someone standing just outside the open car door, as defendant had been. Hr'g Tr. at 22:15-23:5, 84:17-85:2; Gov't Post-Hr'g Opp'n Mem. at 3. Unlike in *People v. Aquino*, for example, the contraband was visible from the officer's search of the car *and* in plain view from a lawful vantage point outside of the car. *Aquino*, 500 N.Y.S.2d at 678–79 (finding a search improper because officer "bent his head into the car to conduct a visual inspection of *what would otherwise be hidden from plain view*." (emphasis added)); *see also United States v. Pettiford*, 293 F. Supp. 2d 22, 24 (D.D.C. 2003) (noting that a weapon placed in a hat was in plain view on the floorboard of the car, and contemplating that the officers "would have undoubtedly noticed the gun . . . when they properly entered the parked car to turn off the running engine," even though the discovery was made by peering through the car's windshield).

Officer Taveras's search of the vehicle is not relevant to the plain view doctrine. What matters is that the evidence *could* be plainly viewed from a lawful position, which was the wide open car door. *South Dakota v. Opperman,* 428 U.S. 364, 367-68 (1976) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation . . . it travels through public thoroughfares where both its occupants and its contents are in plain view.") (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974)). Defendant generally has "no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Brown*, 460 U.S. at 740 (internal citations omitted); *see also Class*, 475 U.S. at 118 (an object "ordinarily in plain view of someone outside the automobile" is not "subject to a reasonable expectation of privacy.").

Here, defendant's gun was visible to anyone standing at the open door of the car, and the incriminating nature of the gun was immediately apparent to anyone observing it. *Dickerson*, 508 U.S. at 375. The officers had a lawful right to seize it, and the firearm and ammunition are admissible evidence at trial.

### 2. Narcotics

As noted in *supra*, section II.B, the court finds that neither defendant nor Ms. Beniquez had been smoking marijuana when the officers approached, and that as a result, Officer Taveras did not inquire whether they had been smoking and did not receive a marijuana cigarette from defendant.

But this does not lead to the suppression of the drugs found on defendant, because they were found in a lawful search subsequent to arrest.

After the officers seized the illegal firearm, they had probable cause to arrest defendant and bring him to the police precinct for further interrogation. *Escalera*, 361 F.3d at 743. Once defendant was arrested on probable cause for possessing a firearm, the police required no further justification to carry out a search of his person incident to arrest. *Robinson*, 414 U.S. at 235. The crack cocaine and marijuana found on defendant's person during this search are therefore admissible evidence at trial. The court need not reach the question of whether the officers would inevitably have discovered the evidence due to the outstanding warrant on defendant.

### B. Post-Arrest Statements

### 1. Coercion by Threat

Defendant argues that his written statement should be suppressed because it was coerced. He contends that it was "procured through an unlawful threat to a family member," because he and his girlfriend were held together in the same room and told that if defendant did not write a

statement taking responsibility for the gun, the officers would call ACS to take away her custody of her eight children. Def.'s Mot. at ¶¶ 12-13.

The government has proven that the defendant's confession is voluntary beyond a reasonable doubt, even though a "preponderance test" would suffice. *Connelly,* 479 U.S. at 168.

The totality of the circumstances shows that defendant was not coerced into making his written statement. He was familiar with criminal procedure and his rights, since he had been arrested on at least six prior occasions and several convictions have resulted from these arrests. *Green*, 850 F.2d at 902; Gov't Opp'n Mem. at 11. Defendant has not indicated that he was subjected to any prolonged questioning, physical deprivations, long restraint in handcuffs, or any physical mistreatment. *Green*, 850 F.2d at 902; Gov't Opp'n Mem. at 11. To the contrary, the time span between the arrest and the confession was only forty minutes. *Green*, 850 F.2d at 902; Gov't Opp'n Mem. at 11.

Defendant alleges that police officers threatened that they would be required to call the ACS and the New York State licensing board in the event that both defendant and his girlfriend were arrested. Def.'s Mot. at ¶ 12. The government denies that these statements were made (a denial the court finds true). It was within the police officers' authority and duty to call ACS if parents of children are arrested. Gov't Mem. at 12. Notification to the defendant and his girlfriend of a potential procedure predicated on protecting the welfare of Ms. Beniquez's children was appropriate under the circumstances.

The first statement was obtained 20 minutes after defendant had received written *Miranda* warnings and signed a waiver acknowledging his rights. Gov't Mem. at 11; Hr'g Tr. at 204:3-25; Ct. Ex. 2, Gov't. Ex. 3. His statement was made voluntarily, not under threat, after he was fully informed of his rights. It is admissible.

### 2. Two-Step Interrogation

Defendant argues that because the prior statement was coerced and inadmissible, the second videotaped statement is also inadmissible because it was obtained as part of a coercive two-step interrogation procedure. Def.'s Mot. at ¶¶ 14-15.

Since defendant was given and waived his *Miranda* rights before both of his "confessions," and because the first confession was not made under coercion, the court need not evaluate *Seibert* factors. It finds that the second confession was not obtained subject to a coercive two-step interrogation. *Moore*, 670 F.3d at 229 ("[W]as the initial statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further."). The second statement is admissible.

### 3. The McNabb-Mallory Rule

Defendant argues that the second statement is inadmissible because it was obtained during a questioning that occurred more than six hours after his arrest, without any justification. Def's Mot. at ¶ 16; Def.'s Post-Hr'g Mem. at 8-9. The requirement that a court must decide the reasonableness of bringing a defendant before a magistrate judge more than six hours following his arrest only applies to federal detentions. 18 U.S.C. § 3501(c); *Alvarez-Sanchez*, 511 U.S. at 358. The court must therefore determine whether there was a "working arrangement" between local and federal officers sufficient to apply the section 3501(c) of the United States Code, title 18 requirement to this matter. *Anderson*, 318 U.S. at 356.

In *Anderson*, defendants were illegally detained by a local sheriff and subsequently questioned by federal agents over the course of six days before they were charged with federal crimes. *Id.* at 353. Here, as the government points out, federal officers did not participate in the interrogation; the arrest and interrogation were carried out by the NYPD and referred to the

Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for a federal prosecution.  Gov't Opp'n Mem. at 13; Gov't Post-Hr'g Mem. at 15-16.

Special Agent Nelson Crespo of the ATF testified at the suppression hearing that "Triggerlock" is an NYPD program that was designed to screen state arrest cases involving firearms that may be eligible for federal prosecution.  Hr'g Tr. at 280:14-281:18.  The ATF's role is to assist the Triggerlock unit by providing information about where a firearm was manufactured.  *Id.*  The United States Attorney's office, not the ATF, decides whether to federally prosecute a case.  *Id.*

Special Agent Crespo had worked with Officer Figueroa on a previous Triggerlock case. On the morning of February 4, 2016, Officer Figueroa called Special Agent Crespo to assist the Triggerlock unit with defendant's case since a gun was involved.  *Id.* at 281:19-23.  Special Agent Crespo spoke with defendant when he arrived at the precinct, but he did not instruct any NYPD officer to hold defendant for further questioning or to ask any questions about his arrest; he, himself, did not ask defendant any questions about the circumstances of his arrest.  *Id.* at 282:2-283:19.

Defendant has not met his burden of showing that state involvement was used to circumvent section 3501(c) of the United States Code, title 18.  *Alvarez-Sanchez*, 511 U.S. at 359-60; *United States v. Torres-Rodriguez*, No. 08-CR-30126-JPG, 2009 WL 1372975, at *7 (S.D. Ill. May 14, 2009).  The facts show no involvement by the federal authorities in this NYPD action.

Aside from a news article indicating that the NYPD works with federal law enforcement to ensure the use of federal racketeering and gun laws, defendant has provided no evidence of improper collusion between local and federal authorities.  Def.'s Mot. at ¶ 17.  When "[f]ederal

officials are not alleged to be involved in determining whether to refer cases for federal prosecution, but only decide whether to *accept* such referrals," that constitutes "routine cooperation between local federal authorities that *Alvarez–Sanchez* found wholly unobjectionable." *United States v. Dantzler*, No. 12-CR-568, 2013 WL 829204, at *10 (E.D.N.Y. Mar. 6, 2013) (emphasis in original) (internal quotation marks omitted).

## V.    Conclusion

Defendant's motion to suppress the physical evidence recovered following his lawful detention, as well as post-arrest statements, is denied. The case will go forward to prompt trial.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:    November 21, 2016
         Brooklyn, New York