# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

May 11, 2020

**Via ECF and Email**
The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   **United States v. George Levy, 16-CR-270 (ARR) (E.D.N.Y.)**
      Reply to Opposition to Emergency Motion for Compassionate Release

Your Honor:

I write in reply to the government's opposition to Mr. Levy's emergency motion for

compassionate release.  ECF Nos. 66, 68.  In opposition, the government casts aside Mr. Levy's

concerns about a virus that has infected more than 1.3 million Americans and killed 79,552, in a

span of less than three months.[1]  Of them, COVID-19 has infected more than 20,119 people in

jails and prisons, and has killed more than 304.[2]  Every day,[3] another person (or several) dies in

the custody and care of the Bureau of Prisons; yesterday, the BOP lost its 48th inmate.[4]

The government belittles the risk of the pandemic, deeming Mr. Levy's motion a quote-

"emergency," ECF No. 68 at 2, proclaims him "healthy," *id*. at 3, three times refers to his

---

[1] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (May 11, 2020), *at* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[2] *A State-by-State Look at Coronavirus in Prisons*, The Marshall Project (May 10, 2020), *at* https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.
[3] *Press Releases*, Federal Bureau of Prisons (May 10, 2020), *at* https://www.bop.gov/resources/press_releases.jsp (announcing deaths in the BOP on May 10, May 9, May 8, May 7, May 6, May 5, May 4, May 3, May 2, May 1, April 30, April 29, April 28, April 27, April 26, April 25, April 24, April 22, April 19, April 18, April 17, April 16, April 15, April 14, April 13, April 12, April 10, April 4, April 3, April 2, April 1, and March 28).
[4] *COVID-19*, Federal Bureau of Prisons (May 10, 2020), *at* https://www.bop.gov/coronavirus/.

1

"purported heart attack," *id*. at 12–13, and boldly asserts that "there is no record of a diagnosis of hypertension or of any other cardiovascular disease in Levy's Bureau of Prisons (BOP) medical records." *Id*. at 3.  The government alleges that Mr. Levy is safer in a county jail, through which corrections officers and new inmates cycle in from the outside world daily, than alone at home with his mother.  *Id*. at 15–18.  And even still, though Mr. Levy has served, without incident, all but eight months of the 70 month sentence imposed by Judge Weinstein, the government deems him too dangerous to release.  *Id.* at 4, 19–21.  The government is mistaken at every turn.

I.     **Mr. Levy Has a Documented History of Heart Disease and Hypertension, Placing Him at Elevated Risk for the Most Serious COVID-19 Complications**

A.     Mr. Levy Had a Heart Attack in 2015

The government casts doubt on Mr. Levy having had a heart attack at all, three times calling it his "purported" heart attack, and noting that the BOP deemed his account "questionable" without any review of his medical records.  ECF No. 68 at 12–13.  This is in spite of the government's own Probation file reflecting Mr. Levy's February 10, 2015 hospitalization at Binghamton General Hospital and transfer to the cardiac floor of Wilson Regional Medical Center.  Mr. Levy reported the heart attack at his E.D.N.Y. Presentence Interview in 2017.  And he has reported it many times while within the BOP, to the best of his recollection, without the ability to consult his medical records.

The government's suggestion that Mr. Levy has been lying about having had a heart attack for the last five years is baffling and disheartening.  To what end?  By reporting his heart attack, Mr. Levy acquired a prescription for aspirin, which lacks recreational properties, and no other benefit.  He has relayed the condition for five years preceding the COVID-19 pandemic; he did not suddenly claim to remember it once he learned that heart disease is a risk factor for complications from the virus.

2

In any event, 172 pages of medical records received from Binghamton General Hospital, enclosed as Exhibit A (filed separately under seal), confirm that the government's doubts were misplaced, and Mr. Levy was telling the truth: he had a heart attack.

On February 10, 2015, at 5:13 A.M., Mr. Levy walked into the Binghamton General Hospital Emergency Department complaining of chest pain. Ex. A at 50. His blood pressure was 164/95. *Id.* An EKG taken at 5:45 A.M. revealed ST elevation in one lead. *Id.* at 83. By 6:45 A.M., a repeat EKG showed ST elevation in three leads: V2, V3, and V4. *Id.* A stat echocardiogram found a wall motion defect at the anteroseptal wall consistent with the change in the EKG. *Id.* Mr. Levy's troponin levels, which indicate myocardial injury, rose from 0.01 to 0.04. *Id.* He was given aspirin and morphine to relieve his pain. *Id.* His initial diagnosis was NSTEMI—Non-ST-elevation myocardial infarction, a type of heart attack—with elevated markers and EKG changes. *Id.* at 45. The cardiologist ordered him transferred, by ambulance, to the Cardiac Catheterization Lab ("Cath Lab") at Wilson Regional Medical Center for "a higher level of care," which occurred at 11:58 A.M. *Id.* at 34–35, 63, 80. Upon arrival at Wilson, Mr. Levy's blood pressure was 183/80. *Id.* at 83. His troponin levels had risen significantly, from 0.01, to 0.04, to now 0.80. *Id.* He was "admitted as a full admit," and he was diagnosed with acute anteroseptal myocardial infarction—again, a heart attack—and accelerated blood pressure, or hypertension. *Id.* at 1, 84.

Mr. Levy was "taken to the Cath Lab urgently." *Id.* at 21. He consented to right and left heart catheterization and coronary angiography. *Id.* at 28. He further consented to percutaneous transluminal coronary angioplasty, described to him as the insertion of a balloon to open blocked arteries, and "possible placement of stents to hold arteries open." *Id.* at 30.[5] Finally, he

---

[5] Fortunately, it does not appear that Mr. Levy required the placement of a stent. His consent to the insertion of stent, followed by catheterization, explains his confusion when he reported to the

3

consented to emergency coronary artery bypass surgery, if indicated.  *Id*. at 32.  The cardiologist performed left heart catheterization, angiocardiography of the left heart structures, and coronary arteriography with two catheters.  *Id*. at 1, 21.  Ultimately, he found mildly-to-moderately elevated left ventricular end-diastolic pressure, at 22mmHg; there was no blockage.  *Id*. at 22.

"Late in the evening" following the catheterization, Mr. Levy asked to leave the hospital. *Id*. at 36.  He was told that he could not be discharged given his cardiac condition.  *Id*. at 156. Mr. Levy decided to leave against medical advice.[6]  *Id*.  He was discharged with a diagnosis of non-Q-wave anterolateral infarction with no specific coronary blockage and accelerated blood pressure.  *Id*. at 36.  He was prescribed aspirin, metoprolol, and statins.  *Id*.

Unfortunately, as shown in Part I(B), *infra*, Mr. Levy's heart problems have continued since 2015, and the damage to specific, critical areas of his heart has worsened, as demonstrated by the results of both an electrocardiogram and echocardiogram while in BOP custody, as well as continued hypertension, placing him at heightened risk for COVID-19 complications, or even death.

B.    Mr. Levy's Cardiac Problems Have Continued Since 2015

Upon review of 445 pages of Mr. Levy's medical records received from the Bureau of Prisons, the government concludes that they contain "no record of any diagnosis of hypertension or any cardiovascular disease."  ECF No. 68 at 3.  This is incorrect.

First, Mr. Levy's BOP medical records demonstrate repeated blood pressure readings in the hypertensive range since his arrest in 2016, consistent with the readings he presented with at

_____

BOP, on January 21, 2019, "They told me they put a stent in me but I'm not sure."  ECF No. 70, Ex. B at 194.

[6] Mr. Levy's recollection that he was in the hospital for eight days was in error.  Rather, his November 29, 2019 statement that he "went home the same day" is accurate.  ECF No. 70, Ex. B at 208.

Binghamton General Hospital in 2015, when he had a heart attack, was diagnosed with hypertension, and was placed on metoprolol, a blood pressure medication.  Ex. A at 1.  The American Heart Association defines high blood pressure as a systolic reading above 130, and a diastolic reading above 80:



| BLOOD PRESSURE CATEGORY | SYSTOLIC mm Hg (upper number) | | DIASTOLIC mm Hg (lower number) |
|---|---|---|---|
| NORMAL | LESS THAN 120 | and | LESS THAN 80 |
| ELEVATED | 120 – 129 | and | LESS THAN 80 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 1 | 130 – 139 | or | 80 – 89 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 2 | 140 OR HIGHER | or | 90 OR HIGHER |
| HYPERTENSIVE CRISIS (consult your doctor immediately) | HIGHER THAN 180 | and/or | HIGHER THAN 120 |

©American Heart Association

heart.org/bplevels

On June 3, 2016, Mr. Levy's blood pressure was measured at 148/91.  Ex. B (additional 2016 BOP medical records, filed under seal) at 57.  On December 21, 2016, it was 155/90.  *Id.* On May 24, 2017, his blood pressure was 134/81.  ECF No. 70, Ex. B (government's submission to the Court of Mr. Levy's BOP records) at 64.  On November 1, 2017, it was 144/96.  *Id.* at 50. On January 5, 2018, Mr. Levy was taken to the Geisinger Medical Center emergency room for a rash on his hand.  *Id.* at 139.  His blood pressure was measured at 137/94.  *Id.* at 140.  His discharge instructions direct him that his blood pressure "was found to be in a hypertensive range."  *Id.* at 158.  On August 24, 2018, his blood pressure was 133/89.  *Id.* at 214.  Weeks later, on September 10, 2019, it was 138/87.  *Id.* at 212.  On November 29, 2018, his blood pressure was 137/86.  *Id.* at 209.  On January 22, 2020, it was 154/97.  *Id.* at 384.[7]

The government alleges that "while Levy has been subjected to numerous different tests

---

[7] To be sure, Mr. Levy has also had blood pressure readings in the normal range.  But he has had many, as noted, in the hypertensive range, including recently.

and assessments of his cardiovascular system, Levy's BOP medical records do not reflect any diagnosed cardiovascular condition or disease." ECF No. 86 at 14. This is false. On November 20, 2018, upon his return from his original N.D.N.Y. VOSR sentencing to FCI Allenwood Medium,[8] the new admit physician diagnosed Mr. Levy with "heart disease, unspecified – Current" and enrolled him in the cardiac chronic care program. *Id*. at 194, 272. The physician started Mr. Levy on 81mg of aspirin daily. *Id*. at 273. When he returned to the doctor nine days later, on November 29, 2018, and his blood pressure read 137/86, a different doctor renewed the prescription, again finding an indication of "Heart disease, unspecified." *Id*. at 209–210. His doctors—at several BOP facilities—renewed the prescription again on January 3, 2019, January 16, 2019, and January 24, 2019. *Id*. at 315.

Second, both an electrocardiogram ("EKG" or "ECG") and an echocardiogram taken of Mr. Levy's heart while within BOP custody demonstrate heart disease—in fact, worsening heart disease since his 2015 heart attack. On April 5, 2018, while at FCI Allenwood Medium, Mr. Levy reported a history of elevated cholesterol and a prior abnormal EKG—the abnormal EKG that led to his heart attack diagnosis in 2015. *Id*. at 8. The doctor ordered an EKG, *id*. at 10, and it was performed on April 10, 2018. *Id*. at 110. The result was exactly as Mr. Levy had indicated happened before: the doctor found an "abnormal ECG." *Id*. at 131. Though the diagnosis was unconfirmed (and the BOP, for reasons unknown, did not send Mr. Levy for any follow up examination), the doctor found "probable left ventricular hypertrophy (LVH)," meeting "multiple LVH criteria," and Q waves anterior. *Id*.

---

[8] The government is correct that Mr. Levy's assertion that he was diagnosed with hypertension while at FCI Fort Dix was mistaken. ECF No. 68 at 5. This was counsel's error; Mr. Levy accurately explains in his letter that while at Fort Dix, he was prescribed mental health medication. *Compare* N.D.N.Y. ECF No. 143 at 1 *with* E.D.N.Y. ECF No. 70, Ex. B. at 366.



Left ventricular hypertrophy is "enlargement and thickening (hypertrophy) of the walls of [the] heart's main pumping chamber (left ventricle)."[9]  The Mayo Clinic explains,

> Left ventricular hypertrophy can develop in response to some factor—such as high blood pressure or a heart condition—that causes the left ventricle to work harder. As the workload increases, the muscle tissue in the chamber wall thickens, and sometimes the size of the chamber itself also increases.  The enlarged heart muscle loses elasticity and eventually may fail to pump with as much force as needed.  Left ventricular hypertrophy is more common in people who have uncontrolled high blood pressure.  But no matter what your blood pressure is, developing left ventricular hypertrophy puts you at higher risk of a heart attack and stroke.  Treating high blood pressure can help ease your symptoms and may reverse left ventricular hypertrophy.

*Id.*  But despite these risks, the BOP did not begin Mr. Levy on blood pressure medication, and

---

[9] *Left Ventricular Hypertrophy*, Mayo Clinic (May 8, 2020), *at* https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/symptoms-causes/syc-20374314.

his hypertensive readings continued.

On January 31, 2019, upon his transfer to FCI Butner II, the intake physician made note of the 2018 EKG with Q waves and ordered an echocardiogram to look for "wall motion abnormalities."  ECF No. 70, Ex. B at 193, 197.  Prior to the echocardiogram, and one day after Mr. Levy signed a release for his records from Binghamton General Hospital, the doctor concluded Mr. Levy's heart disease "resolved" without receipt of his prior medical records.  But the echocardiogram performed on March 5, 2019 showed myriad problems, and they were consistent with the EKG.  *Id.* at 333.  The same problematic left ventricle—the heart's main pumping chamber—was dilated.  *Id.*  The aortic valve showed mild regurgitation.  *Id.*  The mitral valve was thickened, with mild bileaflet prolapse and mild regurgitation.  *Id.*  And the pulmonic valve also showed mild regurgitation.  *Id.*

CONSULTATION REPORT

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| Name:    Levy, George | |
| Reg. #:   18658-052 | Referred By:  BUTNER FCI |
| DOB:      11/30/1982 | Attending:  MOORE, ERIC |

PROCEDURE: Echocardiogram.

| Date of Visit: 03/05/2019 | Dictation Received: 03/05/2019 | Dictation Transcribed: 03/06/2019 |

Seen 2/12/19

Sensitive but Unclassified

ECHOCARDIOGRAM
FINDINGS:
1.  Left ventricle is mildly dilated.  Wall thickness is normal.  Ejection fraction is normal.  Wall motion is symmetric.
2.  Left atrium is normal in size.
3.  Right ventricle and atrium are normal in size and function.
4.  Aortic valve is trileaflet.  It opens and closes well.  There is mild regurgitation but no stenosis.
5.  Mitral valve is thickened.  There is mild bileaflet prolapse with mild regurgitation.  There is no stenosis.
6.  The pulmonic valve mild regurgitation.  No stenosis.
7.  Pulmonic valve no significant stenosis or insufficiency.  It appears structurally normal.
8.  Aortic root is normal in size.
9.  Pericardium no effusion.
10.  Inferior vena cava is normal in size.

| Signature: |
| Eric Moore, MD |

EM
Electronically Signed 03/06/2019 09:18

Job No: 306631

When the left ventricle is dilated, it "stretches and thins (dilates) and can't pump blood as

well as a healthy heart can."[10]  It can be life-threatening, as it is a common cause of heart failure, and can contribute to blood clots or sudden death." *Id*.  Aortic valve regurgitation occurs when the heart's aortic valve doesn't close tightly, preventing the heart from efficiently pumping blood to the rest of the body.[11]  The major complication that can result is heart failure.  *Id*.  Mitral valve disease, with thickening, prolapse, and regurgitation indicate that the valve between the left atrium and left ventricle does not work properly.[12]  It can result in blood clots, heart failure, and stroke.  *Id.*  Regurgitation of the pulmonic valve causes blood to leak backward into the right ventricle of the heart, limiting the flow of oxygen to the rest of the body.[13]

A comparison of the 2019 echocardiogram, ECF No. 70, Ex. B at 333, and the 2015 echocardiogram, Ex. A at 37, demonstrate Mr. Levy's continuing, and in some ways, worsening, heart condition:

|                | 2015 Echocardiogram | 2019 Echocardiogram |
|----------------|---------------------|---------------------|
| Left Ventricle | Grossly normal | Mildly dilated |
| Mitral Valve | Mild bileaflet prolapse, mild to moderate regurgitation | Thickened, mild bileaflet prolapse, mild regurgitation |
| Pulmonic Valve | Normal | Mild regurgitation |

The results of Mr. Levy's 2018 electrocardiogram and 2019 echocardiogram, his many hypertensive blood pressure readings, his diagnosis within the BOP of heart disease, and his continued prescription for daily aspirin indicate that the heart condition that resulted in a heart attack in 2015 is not resolved.  This raises a significant danger of deadly complications should he

---

[10] *Dilated Cardiomyopathy*, Mayo Clinic (May 8, 2020), *at* https://www.mayoclinic.org/diseases-conditions/dilated-cardiomyopathy/symptoms-causes/syc-20353149.

[11] *Aortic Valve Regurgitation*, Mayo Clinic (May 8, 2020), *at* https://www.mayoclinic.org/diseases-conditions/aortic-valve-regurgitation/symptoms-causes/syc-20353129.

[12] *Mitral Valve Disease*, Mayo Clinic (May 8, 2020), *at* https://www.mayoclinic.org/diseases-conditions/mitral-valve-disease/symptoms-causes/syc-20355107.

[13] *Pulmonary Valve Disease*, Mayo Clinic (May 8, 2020), *at* https://www.mayoclinic.org/diseases-conditions/pulmonary-valve-disease/symptoms-causes/syc-20350654.

contract COVID-19.

Alarmingly, scientists have found that the exact problem identified by Mr. Levy's cardiologist at the time of his heart attack—elevated left ventricular end-diastolic pressure ("LVEDP")—may place patients at increased risk for developing subsequent heart failure or death.[14]  Mr. Levy's LVEDP at the time of his heart attack was 22 mmHg.  A study of 437 patients who, like Mr. Levy, had a prior heart attack with the same mean mmHg (22.9), found that 108 suffered either severe heart failure or death sometime in the next 36 months.[15]  The study thus confirmed that individuals who have suffered a prior heart attack are "at increased risk for subsequent fatal and non-fatal cardiovascular events,"[16] particularly when they had LVEDP levels just like Mr. Levy's.

Based on early reports, 40% of hospitalized COVID-19 patients had cardiovascular disease and data show a 10.5% death rate among people with COVID-19 who also have heart disease.[17]  Harvard specialists in epidemiology and infectious disease are learning that "heart damage has recently emerged as yet another grim outcome in the virus's repertoire of possible complications."[18]  It appears that "people with preexisting heart disease are at a greater risk for severe cardiovascular and respiratory complications from COVID-19" and "[r]esearch also shows that heart attacks can actually be brought on by respiratory infections such as the flu."  *Id.*  Here in New York State, hypertension is by far the most common comorbidity by fatality: of

---

[14] Lisa M. Mielniczuk MD, et al., *Left Ventricular End-Diastolic Pressure and Risk of Subsequent Heart Failure in Patients Following an Acute Myocardial Infarction*, Congestive Heart Failure (May 7, 2007), at 209, *at* https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1527-5299.2007.06624.x.

[15] *Id*. at 213.

[16] *Id.*

[17] *What Heart Patients Should Know About Coronavirus*, American Heart Association (Mar. 24, 2020), https://www.heart.org/en/news/2020/02/27/what-heart-patients-should-know-about-coronavirus.

[18] *Coronavirus and the Heart*, Harvard Medical School (Apr. 13, 2020), *at* https://hms.harvard.edu/news/coronavirus-heart.

21,478 deaths, 11,742 patients suffered from hypertension.[19]  And recent reports from autopsies of patients who have died of the coronavirus indicate that the apparent respiratory failure that causes death in serious cases may actually be attributable to blood clots that move from the arteries into the lungs, suggesting that individuals with cardiovascular problems are actually at much higher risk for adverse outcomes than, for example, patients suffering from respiratory conditions such as asthma.[20]

Several courts, including this Court, have held that the risk of COVID-19 infection for individuals with heart disease and hypertension is of acute concern and cause, among other factors, for finding extraordinary and compelling circumstances warranting compassionate release.  *See, e.g.*, *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020); *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020); *Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020).

Your Honor should find Mr. Levy's condition all the more concerning, because it is not limited to his high blood pressure: he has already had a heart attack, when he was only 32 years old, indicating his heart's fragility.  And the objective, credible, consistent evidence demonstrates that it is still a problem, leaving him vulnerable right now.

---

[19] *Fatalities*, New York State Department of Health (May 10, 2020), *at* https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n.

[20] *See, e.g.*, Ariana Eunjung Cha, *A Mysterious Blood-Clotting Complication is Killing Coronavirus Patients*, Washington Post (Apr. 22, 2020), *at* https://www.washingtonpost.com/health/2020/04/22/coronavirus-blood-clots/; Jonathan Allen, *Alarmed as COVID Patients' Blood Thickened, New York Doctors Try New Treatments,* Reuters (Apr. 22, 2020), *at* https://www.reuters.com/article/us-health-coronavirus-usa-blood/alarmed-as-covid-patients-blood-thickened-new-york-doctors-try-new-treatments-idUSKCN22421Z.

## II.    Mr. Levy Is Clearly Safer Alone at Home With His Mother than In Jail

The government seriously contends that Mr. Levy is at lower risk of contracting COVID-19 while incarcerated inside of the Broome County Jail than in his mother's Brooklyn apartment. This idea is foolish and offensive, and has been roundly rejected by courts.  It is beyond dispute, at least to the United States Centers for Disease Control and Prevention, that "there are many opportunities for COVID-19 to be introduced into a correctional or detention facility," including, as relevant here, "daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems…[and] to outside medical visits."[21]  "Some settings,"—like the Broome County Jail—"particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions."

Rejecting the exact same argument—there, that moving from FCI Schuykill's apparent "0% confirmed infection rate" to New York City "will make it far more likely that the defendant suffers from COVID-19 in the next six months," Judge Carter succinctly held, "In terms of the government's argument that Mr. Prado would be safer than he would be at home with his family, I understand why the government makes that argument, but I don't buy that argument, so we don't need to spend a lot of time on that."  *United States v. Prado*, 13-CR-811 (ALC), ECF Nos. 719 at 7; 722 (S.D.N.Y. Apr. 30, 2020); Tr. of Hrg. Apr. 30, 2020 (attached as Ex. C).  Judge Nathan explained, "The risk to incarcerated individuals…is acute; as this Court has explained, individuals in carceral settings are at particularly high risk for contracting the disease because of the inability to individuals to socially distance, shared communal spaces, and limited access to

---

[21] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (Mar. 23, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

hygiene products." *United States v. Scparta*, 18-CR-578 (AJN), 2020 WL 1910481, at *7

(S.D.N.Y. Apr. 20, 2020) (*citing Coronel v. Decker*, 20-CV-2472 (AJN), 2020 WL 1487274, at

*3 (S.D.N.Y. Mar. 27, 2020)).  Simply put: "[T]here is a big difference between being confined

at a prison where one has almost no control over measures taken to guard against the COVID-19

virus and being subject to home confinement where one can almost fully control all risks of

exposure." *United States v. Vence-Small*, 18-CR-31 (JAM), 2020 WL 2214226, at *3 (D. Conn.

May 7, 2020).

Further, the government criticizes Mr. Levy for his "wildly inaccurate," "incendiary,"

"over-the-top" descriptions of the Broome County Jail as a COVID-19 "hot spot."  ECF No. 68

at at 3, 15, 17.  But Mr. Levy's account of the conditions at the jail came directly from Broome

County Executive Jason Garnar, hardly a party biased in favor of the inmates in his county's jail.

ECF No. 66 at 2.  The government's assurances that COVID-19 is a thing of the past inside the

Broome County Jail, ECF No. 68 at 17, if true, would be a comfort.  But there is every reason to

believe that conclusion is naïve, or at the least, premature.  At the outset, while the government

applauds Broome County Jail for its "stockpile" of 150 COVID-19 tests, it does not appear to be

using them in any widespread manner.  This can cause tremendous false confidence.

Consider the case—within the United States BOP—at FCI Lompoc.  On May 6, 2020 the

BOP measured 52 positive inmates in their population of 1,162 inmates, a 4% infection rate.  *See*

Ex. D (screenshot of BOP website).  On May 10, 2020, after the roll-out of mass testing, the

BOP has diagnosed **842** positive inmates, plus 20 so-called "recovered" inmates who earlier

tested positive.[22]  In other words, in reality, 862 of 1,162—74%, not 4% as reported four days

prior—of the prison had been infected, and that number is rising every day.

---

[22] *COVID-19 Coronavirus*, Federal Bureau of Prisons (May 10, 2020), *at* https://www.bop.gov/coronavirus/.

On April 23, 2020, Broome County, in its entirety, has 232 tested-positive cases.  ECF No. 66 at 5 n.14.  Today, Broome County has 373 cases.[23]  The government assures this Court that the 10 positive inmates at the time of Mr. Levy's motion is now zero.  But the BOP's own data at FCI Danbury demonstrates another, separate flaw in the government's assurances: after apparently peaking at 45 positive inmate cases, and dropping to 5 positive inmates on April 27, 2020, today, FCI Danbury is right back up to 27 new positive inmates.[24]



What's more, the government asks this Court to take its word for it at a county facility that has a frightening recent history: since 2011, the facility has seen nine inmate deaths.[25]  As the government notes, the jail is incredibly small, holding only 269 inmates on April 28, 2020,

[23] *NYSDOH COVID-19 Tracker*, New York State Department of Health (May 10, 2020), *at* https://covid19tracker.health.ny.gov/.

[24] *BOP: COVID-19 Update*, Federal Bureau of Prisons (Mar. 26, 2020 to May 10, 2020), *at* https://www.bop.gov/coronavirus/ (daily historical screenshots on file with undersigned counsel).

[25] Anthony Borrelli, *Broome County Jail Deaths Put Spotlight on Inmate Medical Care*, Binghamton Press & Sun-Bulletin (Mar. 3, 2020), *at* https://www.pressconnects.com/story/news/local/2020/03/03/broome-county-jail-inmates-dead-after-lack-medical-health-care-ny-new-york/4857588002/.

with a maximum capacity of 600.  ECF No. 68 at 15.  Among them, the official New York State

Commission of Corrections investigation found that Alvin Rios was left "in an emergent, life-

threatening status without appropriate medical attention" before he was found dead in the

Broome County Jail on July 20, 2011.  *See* n.25.  A 2015 death resulted from "untreated

pneumonia and two drugs that should not have been prescribed together," and was settled in

federal court.  *Id*.

It is beyond serious dispute that being confined to his home, via electronic monitoring,

with only one other person—his mother—places Mr. Levy at less risk of contracting COVID-19

than in a pretrial, local, small county jail, where his movement and meals are directed and served

by staff that cycle in and out, and new arrestees cycle into his unit on a daily basis.  Mr. Levy has

advised that inmates who report COVID-19 symptoms to staff are isolated in solitary

confinement, making people less likely to report their concerns.  Masks are exchanged on

Mondays and Thursday; the cleaning solution provided to inmates lacks alcohol or bleach, and

soap is scarce.  Conversely, his mother's apartment contains one person, herself, who thankfully

has not suffered from COVID-19.  If Mr. Levy were to somehow contract the virus while inside

of his apartment, rather than in the Broome County Jail, he would be within minutes of New

York City's world-class hospitals.  He, like all of us, is safest at home.

## III.   Mr. Levy is Not a Danger to the Community.  The 3553(a) Factors, in the Context of a Deadly Pandemic, Point Towards Release.

Finally, the government argues that even if Mr. Levy can establish, as he has,

extraordinary and compelling health reasons to be released in the midst of a pandemic, those

reasons are outweighed by the danger he presents to society.  ECF No. 68 at 19.  Here, the

government seeks to re-litigate Mr. Levy's 2017 sentencing before Judge Weinstein, rather than

assess his present risk.  The government's conclusion is wrong.

On August 3, 2017, Judge Weinstein sentenced Mr. Levy to a within-guidelines sentence of 70 months.  ECF No. 54 at 6–10.  In a written order, he explained his reasons, accounting for Mr. Levy's criminal history, his commission of the crime while on supervised release, and the nature and circumstances of the instant offense.  *Id*.  He ordered the Bureau of Prisons to run Mr. Levy's incarceratory sentence concurrently with an incarceratory sentence, if imposed, on the N.D.N.Y. supervised release violation; the Bureau of Prisons disregarded that order when it conflicted with Judge McAvoy's later consecutive order.  *Id*.

The government insists that Mr. Levy has served "just over half" of his prison sentence, and therefore continues to be a danger to the community, requiring specific deterrence and punishment.  ECF No. 68 at 21.  But the government's account overlooks the functioning and regulations of the Bureau of Prisons generally, as well as Mr. Levy's conduct specifically.  Mr. Levy's BOP time calculation sheet, Exhibit E, shows that he has earned 100% of his good time—216 days—since his sentence began on February 4, 2016.  Ex. E at 4.  To date, he has served 51 months, 8 days in custody.  On a 70 month sentence, with 54 days per year of good time, as Mr. Levy has accrued, the term is fully satisfied at 59 months, 15 days.  Accordingly, had the Bureau of Prisons honored Judge Weinstein's ruling, Mr. Levy would owe just eight months, would already be past-due for his one year of halfway house eligibility, and would be coming up on even his pre-CARES Act home confinement eligibility date two months from now.

Accordingly, through his discipline-free conduct in the BOP, Mr. Levy has proven that the 3553(a) conclusions reached by Judge Weinstein warrant his release now—even notwithstanding COVID-19 and his comorbidities.  As Judge Carter noted in *Prado*, "The dangerousness considerations needs to be cabined to the six-month period of time in between the time in which he would be released, if he were released today, and the expiration of his custodial

term.  I would not have the authority to, at the end of his custodial sentence, keep him in custody because I found that he might be a danger to the community…"  Ex. C at 7–8.  This is beyond dispute.  Here, release at more than 51 months into the 59.5 month effective custodial sentence imposed by Judge Weinstein is eminently reasonable, weighed against Mr. Levy's heart condition in the midst of a deadly pandemic.

This is the case even when this Court considers, as it must, that Mr. Levy continues to owe time on his N.D.N.Y. violation sentence.  To start, rather than serving "just over half" of his sentence, Mr. Levy's good time credits mean that he has effectively served 64% of his sentence (counting from his arrest on February 4, 2016 until his BOP release date of October 8, 2022).  And though it is Judge McAvoy who will ultimately decide whether Mr. Levy is released, it bears noting that in ways that could not be foreseen, the sentencing calculus is different now than it was on March 12, 2020, when he imposed the 24 month term.

When Judge McAvoy sentenced Mr. Levy, the world was unimaginably different than it is today, just two months later.  COVID-19 was not mentioned at his sentencing hearing, whether by counsel, Judge McAvoy, or Mr. Levy himself.  Ex. F (Tr. of Sent., N.D.N.Y Mar. 12, 2020).  As Mr. Levy stated correctly in his April 13, 2020, pro se letter to the Court, "I had no idea of the seriousness of COVID-19."  N.D.N.Y. ECF No. 143 at 1.  Mr. Levy was not alone: when Judge McAvoy imposed his sentence, Broome County had not yet reported its first positive case of the coronavirus; it would come later that same day, as shown on New York State's COVID tracker on the next page.[26]  Today, following 373 Broome County cases, an even a documented infection rate within the Broome County Jail that vastly exceeds the general population, it is fair to assume that Judge McAvoy's weighing of the 3553(a) factors would have been different.

---

[26] *See* n.23.

17



As Judge Nathan explained late last week, "The Court's substantial sentence of 84 months reflected the seriousness of Mr. Pena's offense and these mitigating factors, and was at the time sufficient, but no greater than, necessary to achieve the purposes of sentencing.  But the Court's analysis is different in current circumstances."  *United States v. Pena*, 15-CR-551 (AJN) (S.D.N.Y. May 8, 2020) (attached as Ex. G).  Even at the time of sentence, Judge McAvoy recognized that Mr. Levy "[hadn't] been in any trouble," and had received "no tickets," a discipline-free record undisputed by the government.  Ex. F at 6.  At the same time, he completed a drug program, worked for UNICOR and in the facilities department doing plumbing, and completed an inmate-facilitated counseling program for troubled youth.  Judge McAvoy "[took] cognizance of the efforts" Mr. Levy made to improve himself.  *Id.* at 7–8.  Accordingly, on remand from the Circuit, he reduced his previously imposed term of 40 months to 24 months—absent any consideration at all of COVID-19 and Mr. Levy's personally heightened risks.  *Id.* at 8.

Now, balancing the 3553(a) factor against Mr. Levy's extraordinary and compelling circumstances demonstrates that he should be released, not to liberty, but to round-the-clock

18

home confinement, which this Court may impose in terms of additional years of supervised release on top of the three year term already imposed.  It bears noting that Mr. Levy's offense conviction, while serious, was for possession and not use of a firearm, not a crime of violence, and hardly singular in recent grants of compassionate release.  *See, e.g.*, *Pena*, 15-CR-551 (AJN) (Hobbs Act robbery); *Prado*, 13-CR-811 (ALC) (string of burglaries); *United States v. Bryant*, 2020 WL 2085471 (D. Md. Apr. 30, 2020) (several armed bank robberies); *United States v. Haynes*, No. 93-CR-1043 (RJD) (E.D.N.Y. Apr. 22, 2020) (multiple bank robberies); *Poulios v. United States*, 2020 WL 1922775 (E.D. Va. Apr. 21, 2020) (bank robbery); *United States v. Hammond*, 2020 WL 1891980 (D.D.C. Apr. 16, 2020) (gunpoint robbery); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (armed bank robbery); *United States v. Williams*, 3:04-cr-95 (N.D. Fl. Apr. 1, 2020) (armed robbery and brandishing firearm); *United States v. Curtis*, 2020 WL 1935543 (D.D.C. Apr. 22, 2020) (sex trafficking of minors); *United States v. Marks*, No. 03-CR-6033L (W.D.N.Y. Apr. 20, 2020) (drugs and firearms offenses); *United States v. Campagna*, 16-cr-78-01-LGS (S.D.N.Y. Mar. 27, 2020) (firearms trafficking); *United States v. Copeland*, 2:05-cr-00135 (D.S.C. Mar. 24, 2020) (felon in possession of a weapon and ammunition, among other crimes).  And while he has a criminal record, it is not an "alarmingly bad criminal history," and as Judge Karas noted in granting compassionate release nonetheless—on a defendant owing 4 years—"the risk of re-imprisonment from committing crimes while on supervised release should be a sufficient deterrent."  *United States v. Cooper*, 08-CR-356 (KMK) (S.D.N.Y. Apr. 28, 2020), ECF No. 181.

Mr. Levy committed a serious crime, and he did so while serving a term of supervised release.  That conducted warranted a substantial sentence, and he has already served a substantial sentence.  But the Court's analysis ought to be "different in current circumstances" as COVID-

19 risks Mr. Levy's already weakened heart while he in confined to the Broome County Jail.  His

particular circumstances warrant compassionate release.

       Thank you for your consideration.

                     Respectfully submitted,

                          /s/
                     Mia Eisner-Grynberg, Esq.
                     Assistant Federal Defender
                     (914) 355-6493

cc:    AUSA Ian Richardson (E.D.N.Y.) (by email and ECF)
       AUSA Andrew Beaty (N.D.N.Y) (by email)
       Melissa Touhey, Esq. (by email)

# EXHIBIT A

## 2015 Binghamton General Hospital
## Medical Records
## (Filed separately under seal)

# __EXHIBIT B__

## 2016 BOP Medical Records
## (Filed separately under seal)

# **EXHIBIT C**

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        13 CR 811 (ALC)

5    JOEL PRADO,

6              Defendant.               Telephone Conference

7    ------------------------------x

8                                       New York, N.Y.
                                        April 30, 2020
9                                       11:00 a.m.

10   Before:

11
                        HON. ANDREW L. CARTER, JR.,
12
                                        District Judge
13
                             APPEARANCES
14
     GEOFFREY S. BERMAN
15        United States Attorney for the
          Southern District of New York
16   BY:  HAGAN C. SCOTTEN
          Assistant United States Attorney
17
     CESAR DE CASTRO
18        Attorney for Defendant

19

     Also Present:
20   Edward W. Johnson, U.S. Probation

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.•
                           (212) 805-0300

```
 1              (Case called)

 2              MR. SCOTTEN:  Good morning, your Honor, this is Hagan

 3   Scotten for the government.

 4              MR. DE CASTRO:  Good morning, your Honor, Cesar De

 5   Castro for Joel Prado.

 6              MR. JOHNSON:  Good morning, your Honor, Ed Johnson

 7   from probation.

 8              THE COURT:  Good morning, everyone.

 9              As an initial matter let me just confirm from defense

10   counsel that you waive your client's appearance for the

11   purposes of this appearance?

12              MR. DE CASTRO:  Yes, your Honor.

13              THE COURT:  In addition, we are conducting this

14   conference by way of telephone.  I find that, unfortunately,

15   video conferencing is not available for this call, so we will

16   proceed by telephonic conference.

17              I read everything that counsel has submitted.  Before

18   I hear from counsel, let me just state that:  Upon reading the

19   briefing, it's my inclination to modify the sentence and to

20   order Mr. Prado released with a time-served sentence and

21   continuing the same conditions of supervised release that were

22   initially imposed and not requiring any home confinement or

23   home detention.

24              I want to make sure, however, that there is a release

25   plan in place for Mr. Prado because my understanding is that
```

1    the facility where he is incarcerated is approximately two and

2    a half hours from New York City.  And I want to make sure that

3    if he is in fact released, he will be able to get to New York

4    City in a safe manner that will not expose him unnecessarily to

5    COVID-19.

6         In addition, in terms of the government's argument

7    that Mr. Prado would be safer than he would be at home with his

8    family, I understand why the government makes that government,

9    but I don't buy that argument, so we don't need to spend a lot

10   of time on that.

11        Having said all that, and I'm open to perhaps changing

12   my mind, let me hear from defense counsel first.

13        MR. DE CASTRO:  Judge, obviously, with what you've

14   indicated as your inclination, I don't have anything additional

15   to add on my argument.

16        With respect to how he would get back, assuming that

17   you don't change your mind, I think what I would propose is

18   that I already know who would be picking him up, either his

19   brother or his wife, but I would just have to confirm that.

20   And I could provide the Court with a very, very detailed letter

21   in terms of who would be picking him up to make sure that they

22   have PPE, the exact address where he would go, how he could

23   isolate or quarantine, if necessary, how that could work.  I

24   could put that letter together very quickly.

25        Other than that, I wouldn't have anything to add

1    unless the Court has any particular questions.

2          THE COURT:  Let me hear from counsel for the

3    government.

4          MR. SCOTTEN:  Sure, your Honor.

5          I will be brief on the primary or the longest point in

6    our brief, since the Court has already indicated.  The

7    government is not inclined to agree.

8          Just for the sake of clarity, because the government's

9    position is different, I suppose I should briefly state that I

10   understand defense's argument that, well, it could be worse in

11   the Bureau of Prisons, but he is relying on an affidavit that's

12   now a month old.  And a month ago I understood there was a

13   great concern about what might happen in the Bureau of Prisons.

14   But since then we know that the forecast outbreak simply has

15   not occurred.

16         And to the extent that the Court is inclined to agree

17   with his, essentially, you can't trust the statistics argument,

18   I don't care that the infection rate in New York City is far

19   higher than BOP, maybe it's because of a lack of testing.  You

20   could look at the death rate, your Honor.  Obviously, you don't

21   need to test to know if someone dies.  These are often the

22   statistics that have been looked at in the current coronavirus

23   crisis because when someone dies, then obviously you know.  As

24   of today, 31 federal inmates have died, which puts the rate of

25   death in the Bureau of Prisons far less than 10 percent of that

1    in New York City.

2            I understand the Court has taken a different view.

3    but from the government's perspective, I sort of can't see how

4    this isn't just endangering the defendant because he wants to

5    get out of jail, which of course I understood.

6            The government remains of the view this is not a valid

7    grounds for release because it essentially is just greatly

8    endangering the defendant.

9            Leaving that point aside, I'll move on to the second

10   point which we made in our brief, which I think was not

11   answered in the defendant's reply brief and which is also a

12   statutory bar to reducing his sentence.  This Court determined

13   that the just sentence was 39 months.  I don't take anybody to

14   suggest that the defendant has done anything during his time in

15   prison to render that sentence unjust.  That is still half the

16   guidelines sentence and the amount your Honor determined was

17   just.

18           In order to shorten that sentence now, the Court would

19   have to find, given that the statute incorporates the

20   guidelines here, that the defendant does not present any danger

21   to the community.  The Court would have to say, I want to let

22   him out six months earlier than I determined was just because I

23   no longer think he is any danger to the community.  I don't

24   think there is any grounds to make that finding nor, frankly,

25   has defense counsel, who bears the burden here, presented them.

1        Prado managed to get himself in the highest criminal

2   history category by the age of 24, and he did that through a

3   combination of rampant narcotics selling, various other minor

4   crimes, and then violating parole from his prior convictions.

5   And he has demonstrated a consistent pattern of behavior where

6   in prison he behaves well.  He says, I want to rehabilitate

7   myself, I want to go back to my family.  And then when he gets

8   out he commits more crimes.

9        As your Honor has seen, usually, in a hearing like

10  this, it is the government making that argument and then the

11  Court decides to abide.

12       This time it's not the government making that

13  argument.  Your Honor made exactly those characterizations in

14  sentencing him.  I think your Honor saw the transcript cites we

15  attached where your Honor pointed out, look, I get that you

16  behave well in prison.  You consistently behave well in prison,

17  and then you commit crimes when you get out.  I get that it's

18  great that you love your family, but every time you go back to

19  your family, you commit more crimes.  And based on your Honor's

20  conclusions there, you chose a 39-month sentence, which still

21  seems correct today.

22       Given that the Court made those findings, and defense

23  counsel offered nothing in their submission to suggest anything

24  that wasn't present then, the defendant simply does not qualify

25  for release because he cannot show that he's not going to

7

1   commit further crimes.  He has got no new evidence and there is

2   no reason that the Court should re-examine its factual

3   conclusions.

4          Subject to the Court's questions, I don't think he

5   should be released for that reason either.

6          THE COURT:  Any response from defense counsel?

7          MR. DE CASTRO:  Judge, on the first point that the

8   government made in terms of the outbreak and the forecasting

9   and all of that, you just can't do that math if you don't

10  actually have the components of the formula.

11         To determine even a rate of death or determine any of

12  that, you actually need to know how many people are affected.

13  And the Bureau of Prisons just doesn't know that because they

14  are just not testing anybody or they are not testing a lot.  I

15  just learned yesterday that the MCC might actually be getting

16  some testing kits.  That was the most recent news.

17         In terms of Mr. Prado and his criminal history and the

18  government's last argument, I think I'll rest on the papers on

19  that.  I think the Court should reduce the sentence.  He only

20  has six months to go, and he is in a really precarious medical

21  situation, and I don't think we should wait.

22         THE COURT:  Let me ask the government this, get your

23  take on this.  It seems to me that in terms of dangerousness,

24  the dangerousness considerations needs to be cabined to the

25  six-month period of time in between the time in which he would

1    be released, if he were released today, and the expiration of

2    his custodial term.

3           I would not have the authority to, at the end of his

4    custodial sentence, keep him in custody because I found that he

5    might be a danger to the community, so it seems to me that we

6    are talking about this six-month period of time.

7           And it seems that in light of what's going on in New

8    York City in terms of New York City and New York State and this

9    stay-put order, which is expected to extend past May 15 in New

10   York City, and the other social distancing measures that are

11   likely to be in place, that that would significantly ameliorate

12   any danger to the community that Mr. Prado poses because to the

13   extent that there is a danger to the community from releasing

14   him, it would the danger of him perhaps going back into selling

15   narcotics, and I think that that is seriously mitigated by what

16   is happening in New York City as a result of this pandemic.

17          Let me hear the government's take on that and if

18   defense counsel has anything they want to say about that.

19          Starting first with the government.

20          MR. SCOTTEN:  Sure, your Honor.

21          I agree with your Honor's analysis as to sort of the

22   relevant legal period.  The question is, should he get out of

23   jail early, six months early, and, therefore, it is that

24   six-month period of time that is relevant.

25          I note that the defendant has consistently, as your

9

1    Honor noted in the prior sentencing, gone back to committing

2    crimes shortly after getting out of prison.

3           With respect to the theory that the current social

4    distancing, etc. measures would mitigate the defendant's risk,

5    I don't think that makes sense.  We haven't really seen,

6    although it's, of course, hard to tell, a significant decrease

7    in crime because of this.  I think there is a good reason for

8    that, your Honor.  Although social distancing is a rule, a very

9    good rule that should be adhered to by responsible members of

10   society, of course, so are the criminal laws against selling

11   narcotics.

12          The problem is here that theorizing the theory that

13   Mr. Prado is going to be deterred by Governor Cuomo's general

14   admonitions to socially distance himself, given that he has

15   never been deterred by criminal laws threatening to send him to

16   jail, I don't think there is any reason to think these measures

17   will inhibit Prado.

18          In fact, your Honor may be familiar with the

19   unfortunate incidents that have been occurring, probably

20   received undue press coverage, but where people who are still a

21   danger to the community were released from prison because of

22   this sort of thing and immediately went back to committing

23   crimes, causing a little bit of a scandal.

24          You cannot rely, I think, on general social rules to

25   balance -- when you have already said, essentially your Honor

10

 1    said at sentencing, I can't trust you to follow the law.  You

 2    certainly can't trust him to follow social distancing

 3    mechanisms.

 4            That's going to be true of the people he would sell

 5    drugs with as well.  Most of the egregious incidents we have

 6    seen so far is when people got out after jail terms and went to

 7    celebrate with their former partners in crime, who, of course,

 8    are also not terribly concerned with social distancing rules

 9    since they don't tend to be concerned with rules generally.

10            I should also briefly note, so it's not a lack of

11    clarity, Mr. De Castro says, you can't use statistics if you

12    don't have the numbers.  To be clear, the numbers I was relying

13    on were not relative to testing.  It's just relative to BOP

14    population.  We know how many people are in the BOP, and we

15    know how many people are in New York City.  We know that

16    coronavirus has killed nearly 13,000 people in New York City

17    and only 31 people in federal custody.  We know, of course, New

18    York City's population is much larger.  But when you view the

19    percentages just based on population and depth, everyone on

20    this call knows that New York City is a much deadlier place to

21    be than the Bureau of Prisons.

22            THE COURT:  Defense counsel.

23            MR. DE CASTRO:  The one part that the government is

24    failing to appreciate, it's not that Mr. Prado would go home

25    and then be under no supervision whatsoever and just be off to

1    do whatever he wants.

2          The Court has sentenced him to supervised release.  He

3    will be on supervised release and be subject to all the

4    conditions that the Court imposed for supervised release.  The

5    Department of Probation is still working.  They are still

6    supervising people.  I know we have someone from probation on

7    the line.

8          I agree with the Court.  The order is going to extend

9    to New York.  There is virtually nobody on the street.  The

10   thought that he is going to walk out and stand there and start

11   selling drugs in the middle of broad daylight, after having

12   been in jail for the last four years, or actually more because

13   of the state sentence, I just think makes no sense.  That's all

14   I would add there.

15         MR. SCOTTEN:  I would ask your Honor, if you might

16   want to inquire from probation as to what they are actually

17   going to be doing in terms of supervision.  It is my

18   understanding it's been greatly reduced.

19         THE COURT:  OK.  I'll do that.

20         Let me hear from probation.

21         MR. JOHNSON:  Good morning, your Honor.

22         The government is correct.  Our abilities to do what

23   we have done in the past in terms of -- from as simple as

24   bringing people into our office on a regular basis to meet with

25   them, certainly to go and conduct home inspections and visits

 1   in the community, verify employment, although not many people

 2   are employed right now that are under our watch, is essentially

 3   ceased.

 4          Most of what we are doing right now is virtual.  We

 5   are remaining in contact with people on supervision.  We are

 6   asking them to FaceTime or other video app when they are in the

 7   residence so that we can confirm that they are where they say

 8   they are.

 9          We have a very limited number of people coming to the

10   office, and those individuals are the ones that are the

11   highest-risk categories, which I'm guessing Mr. Prado may be

12   in, and also had been, prior to the shutdown, actively using

13   drugs beyond marijuana only.  So we have shrunk that population

14   that's coming into our office significantly.

15          We are continuing to hook people up to ankle bracelets

16   for home confinement, home incarceration, and that's being done

17   in the office after a 14-day quarantine, self-imposed

18   quarantine, Court ordered but self imposed.  So we are doing

19   that.  And then we are monitoring cases with that as a

20   condition.  But still not going to their residence.

21          THE COURT:  Anything else from defense counsel or the

22   government?

23          MR. SCOTTEN:  Your Honor, I suppose I would just say,

24   if your Honor is inclined to find that he's not a danger to the

25   community, even though I think defense counsel essentially

1  submitted nothing on that, he should at least receive home

2  confinement.

3          As your Honor has pointed out, the hope here is that

4  social distancing is why he's not a danger.  He doesn't have a

5  job.  Everybody is supposed to be staying home anyway.

6  Essentially, he shouldn't be leaving his home or getting sort

7  of a get-out-of-jail-free card just because he has ill health.

8  Therefore, I think for both the health and safety of the

9  community, there is no reason he needs the freedom to leave his

10  home since there is no employment or anything to report to

11  anyway.

12          THE COURT:  Anything from defense counsel on that?

13          MR. DE CASTRO:  No, Judge.  Thank you.

14          THE COURT:  Just a moment.

15          I find that the combination of Mr. Prado's health

16  issues, coupled with the outbreak of COVID-19, that that

17  combination presents extraordinary and compelling reasons to

18  reduce his sentence, to modify his sentence to a sentence of

19  time served.

20          I will keep the supervised release conditions in

21  effect that were in effect at the time of sentence.  I have

22  been persuaded by the government that it would be appropriate

23  to impose a condition of an additional special condition of

24  supervised release, that Mr. Prado be on home confinement for a

25  period of six months.

54

 1            Mr. Prado needs to, through counsel, submit a release

 2   plan.

 3            Let me get a sense from counsel, defense counsel, as

 4   to how soon you think this could be arranged.  My inclination

 5   is to impose a sentence of time served, but order that he

 6   remain in custody until a release plan is submitted.  But, in

 7   any event, no later than Monday, May 4.

 8            What is your position on that, counsel?

 9            MR. DE CASTRO:  That would be fine, Judge.  I can have

10   the details of the release plan today.  I'm pretty much in

11   constant contact with the family.  It's a little harder with

12   him because they are only let out of their cells very

13   sporadically.  I should have that today.  That shouldn't be a

14   problem.  I have already reached out to the family regarding

15   that.  I should be able to submit a letter today with that

16   plan, and I expect, from speaking to them, without committing

17   to it, that they are ready to act when the facilities says that

18   they should be there.

19            THE COURT:  Anything from the government on that?

20            MR. SCOTTEN:  No.  Thank you, your Honor.

21            THE COURT:  Mr. Prado, once he is home, he should

22   self-quarantine for 14 days, and he should call the probation

23   office at 212-805-0040 so that they can conduct the intake

24   session and they can seek to impose the conditions of home

25   confinement.

1                Anything else from the government or the defense

2       today?

3                MR. SCOTTEN:  No.  Thank you, your Honor.

4                MR. DE CASTRO:  No, your Honor.

5                THE COURT:  We are adjourned.  Thank you.

6                (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT D**

# COVID-19 Cases

The BOP has **140,708** federal inmates in BOP-managed institutions and **10,817** in community-based facilities. The BOP staff complement is approximately **36,000**. As of 05/06/2020, there are **2100 federal inmates** and **365 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **559** inmates and **149** staff have recovered. There have been **42** federal inmate deaths and **0** BOP staff member deaths attributed to COVID-19 disease.

Due to the rapidly evolving nature of this public health crisis, the BOP will update the open COVID-19 confirmed positive test numbers and the number of COVID-19 related deaths daily at 3:00 p.m. The positive test numbers are based on the most recently available **confirmed lab results** involving open cases from across the agency as reported by the BOP's Office of Occupational Health and Safety. BOP field sites may report additional updates throughout the day. Data is subject to change based on additional reporting.

The BOP has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting. As such, our data reflects an increase in the number of COVID-19 positive tests reflected in the table below. The BOP is able to better utilize this information for the management of an outbreak at the relevant, affected facility.

The inmate totals listed do not include inmates participating in the Federal Location Monitoring program. Additionally, the reference to the FCI Butner Low below refers to an isolation unit that is physically separated from the rest of the LSCI.

| Inmates Positive ▼ | Staff Positive | Inmate Deaths | Staff Deaths | Facility | City | State |
|---|---|---|---|---|---|---|
| 621 | 15 | 6 | 0 | Terminal Island FCI | San Pedro | CA |
| 467 | 1 | 4 | 0 | Fort Worth FMC | Fort Worth | TX |
| 211 | 13 | 6 | 0 | Butner Medium I FCI | Butner | NC |
| 113 | 1 | 0 | 0 | Forrest City Low FCI | Forrest City | AR |
| 105 | 23 | 0 | 0 | Chicago MCC | Chicago | IL |
| 105 | 49 | 8 | 0 | Elkton FCI | Lisbon | OH |
| 57 | 3 | 0 | 0 | Lexington FMC | Lexington | KY |
| 52 | 10 | 0 | 0 | Lompoc FCI | Lompoc | CA |
| 50 | 4 | 0 | 0 | Yazoo City Low FCI | Yazoo City | MS |
| 48 | 17 | 7 | 0 | Oakdale I FCI | Oakdale | LA |
| 40 | 3 | 0 | 0 | Fort Dix FCI | Joint Base Mdl | NJ |
| 34 | 15 | 1 | 0 | Lompoc USP | Lompoc | CA |
| 27 | 3 | 0 | 0 | Butner Low FCI | Butner | NC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 24 | 15 | 1 | 0 | Danbury FCI | Danbury | CT |
| 23 | 0 | 1 | 0 | Oklahoma City FTC | Oklahoma City | OK |
| 20 | 0 | 0 | 0 | Volunteers of America, Inc. (Minnesota) (RRC) | Minneapolis | MN |
| 19 | 0 | 0 | 0 | GEO Reentry, Inc. (RRC) | Leavenworth | KS |
| 15 | 40 | 3 | 0 | Milan FCI | Milan | MI |
| 7 | 0 | 0 | 0 | Community Resources for Justice, Inc. (RRC) | Boston | MA |
| 6 | 4 | 0 | 0 | Aliceville FCI | Aliceville | AL |
| 6 | 0 | 0 | 0 | Central Territorial of the Salvation Army; DBA Salvation Army Correctional Ser (RRC) | Chicago | IL |
| 6 | 8 | 1 | 0 | Yazoo City USP | Yazoo City | MS |
| 5 | 4 | 0 | 0 | Butner FMC | Butner | NC |
| 4 | 6 | 0 | 0 | Atlanta USP | Atlanta | GA |
| 4 | 0 | 0 | 0 | Volunteers of America Texas, Inc. (RRC) | Hutchins | TX |
| 3 | 2 | 0 | 0 | Bennettsville FCI | Bennettsville | SC |
| 3 | 0 | 0 | 0 | Cherry Street Services, Inc. (RRC) | Grand Rapids | MI |
| 3 | 0 | 0 | 0 | Kintock Group, The (RRC) | Philadelphia | PA |
| 3 | 0 | 0 | 0 | Kintock Group, The (RRC) | Newark | NJ |
| 2 | 0 | 0 | 0 | GEO Reentry of Alaska, Inc. (RRC) | Oakland | CA |
| 2 | 8 | 0 | 0 | Oakdale II FCI | Oakdale | LA |
| 1 | 0 | 0 | 0 | Behavioral Systems Southwest, Inc. (RRC) | Los Angeles | CA |
| 1 | 0 | 0 | 0 | CORE Services Group, Inc. (RRC) | Brooklyn | NY |
| 1 | 0 | 1 | 0 | Carswell FMC | Fort Worth | TX |
| 1 | 0 | 0 | 0 | Cherry Street Services, Inc. (RRC) | Detroit | MI |
| 1 | 1 | 0 | 0 | Coleman Low FCI | Sumterville | FL |
| 1 | 0 | 0 | 0 | GEO Care, LLC (RRC) | Sacramento | CA |
| 1 | 0 | 0 | 0 | Gilmer FCI | Glenville | WV |
| 1 | 0 | 0 | 0 | Keeton Corrections, Inc. (Birmingham) (RRC) | Birmingham | AL |
| 1 | 0 | 0 | 0 | Pioneer Human Services; DBA: | Seattle | WA |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0 | Pioneer Industries (RRC) | Seattle | WA |
| 1 | 0 | 0 | 0 | Southeast Missouri Behavioral Health, Inc.; DBA: SEMO CTC (RRC) | Farmington | MO |
| 1 | 0 | 0 | 0 | Volunteers of America (RRC) | Metairie | LA |
| 1 | 0 | 0 | 0 | Volunteers of America of Greater Ohio (RRC) | Toledo | OH |
| 1 | 0 | 0 | 0 | Volunteers of America of Western New York, Inc. (RRC) | Rochester | NY |
| 1 | 0 | 0 | 0 | Watkinson House (RRC) | Hartford | CT |
| 1 | 4 | 0 | 0 | Yazoo City Medium FCI | Yazoo City | MS |
| 0 | 1 | 0 | 0 | Beaumont Low FCI | Beaumont | TX |
| 0 | 3 | 0 | 0 | Beaumont Medium FCI | Beaumont | TX |
| 0 | 0 | 1 | 0 | Behavioral Systems Southwest, Inc. (RRC) | Phoenix | AZ |
| 0 | 31 | 0 | 0 | Brooklyn MDC | Brooklyn | NY |
| 0 | 1 | 0 | 0 | Canaan USP | Waymart | PA |
| 0 | 1 | 0 | 0 | Coleman I USP | Sumterville | FL |
| 0 | 2 | 0 | 0 | Cumberland FCI | Cumberland | MD |
| 0 | 0 | 1 | 0 | Devens FMC | Ayer | MA |
| 0 | 1 | 0 | 0 | Englewood FCI | Littleton | CO |
| 0 | 2 | 0 | 0 | Fairton FCI | Fairton | NJ |
| 0 | 3 | 0 | 0 | Forrest City Medium FCI | Forrest City | AR |
| 0 | 0 | 1 | 0 | GEO Care, Inc. (RRC) | Bronx | NY |
| 0 | 1 | 0 | 0 | Grand Prairie | Grand Prairie | TX |
| 0 | 1 | 0 | 0 | La Tuna FCI | Anthony | TX |
| 0 | 1 | 0 | 0 | Lewisburg USP | Lewisburg | PA |
| 0 | 1 | 0 | 0 | Los Angeles MDC | Los Angeles | CA |
| 0 | 1 | 0 | 0 | McCreary USP | Pine Knot | KY |
| 0 | 1 | 0 | 0 | Memphis FCI | Memphis | TN |
| 0 | 14 | 0 | 0 | Miami FDC | Miami | FL |
| 0 | 29 | 0 | 0 | New York MCC | New York | NY |
| 0 | 10 | 0 | 0 | Otisville FCI | Otisville | NY |
| 0 | 3 | 0 | 0 | Philadelphia FDC | Philadelphia | PA |

| 0 | 6 | 0 | 0 | Ray Brook FCI | Ray Brook | NY |
| 0 | 1 | 0 | 0 | Rochester FMC | Rochester | MN |
| 0 | 1 | 0 | 0 | Southeast RO | Atlanta | GA |
| 0 | 1 | 0 | 0 | Tallahassee FCI | Tallahassee | FL |

# **<u>EXHIBIT E</u>**

```
    DSCEL          *        PUBLIC INFORMATION        *      04-03-2020
PAGE 001           *             INMATE DATA          *      20:28:02
                                AS OF 04-03-2020


REGNO..: 18658-052 NAME: LEVY, GEORGE

                        RESP OF: 6-B
                        PHONE..: N/A            FAX: N/A
                                                RACE/SEX...: BLACK / MALE
                                                AGE:  37
PROJ REL MT: GOOD CONDUCT TIME RELEASE          PAR ELIG DT: N/A
PROJ REL DT: 10-08-2022                         PAR HEAR DT:




G0002       MORE PAGES TO FOLLOW . . .
```

```
   DSCEL          *          PUBLIC INFORMATION          *          04-03-2020
PAGE 002          *          INMATE DATA                 *          20:28:02
                             AS OF 04-03-2020


REGNO..: 18658-052 NAME: LEVY, GEORGE

                        RESP OF: 6-B
                        PHONE..: N/A            FAX: N/A
HOME DETENTION ELIGIBILITY DATE: 04-08-2022


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  10-08-2022 VIA GCT REL

---------------------CURRENT JUDGMENT/WARRANT NO: 030 -----------------------

COURT OF JURISDICTION...........: NEW YORK, EASTERN DISTRICT
DOCKET NUMBER...................: CR16-270(JBW)
JUDGE...........................: WEINSTEIN
DATE SENTENCED/PROBATION IMPOSED: 08-03-2017
DATE COMMITTED..................: 10-05-2017
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO


                 FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $100.00         $00.00          $00.00       $00.00


RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO       AMOUNT: $00.00

------------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....:  136    18:922(G) FIREARMS,GUN CNTL
OFF/CHG: 18:922(G)(1),18:924(A)(2): FELON IN POSSESSION OF AMMUNITION

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   70 MONTHS
 TERM OF SUPERVISION............:    3 YEARS
 DATE OF OFFENSE................: 02-04-2016

---------------------CURRENT JUDGMENT/WARRANT NO: 040 -----------------------

COURT OF JURISDICTION...........: NEW YORK, NORTHERN DISTRICT
DOCKET NUMBER...................: DNYN310CR000512-003
JUDGE...........................: MCAVOY
DATE SENTENCED/PROBATION IMPOSED: 09-06-2012
DATE SUPERVISION REVOKED........: 09-27-2018
TYPE OF SUPERVISION REVOKED.....: REG
DATE COMMITTED..................: 11-15-2018
HOW COMMITTED...................: COMMIT OF SUPERVISED REL VIOL
PROBATION IMPOSED...............: NO




G0002       MORE PAGES TO FOLLOW . . .
```

```
    DSCEL        *        PUBLIC INFORMATION          *        04-03-2020
  PAGE 003       *            INMATE DATA             *        20:28:02
                           AS OF 04-03-2020


  REGNO..: 18658-052 NAME: LEVY, GEORGE


                    RESP OF: 6-B
                    PHONE..: N/A            FAX: N/A
                    FELONY ASSESS  MISDMNR ASSESS  FINES         COSTS
  NON-COMMITTED.: $100.00        $00.00         $00.00        $00.00


  RESTITUTION...: PROPERTY:  NO  SERVICES:  NO        AMOUNT: $00.00

  ------------------------CURRENT OBLIGATION NO: 010 -------------------------
  OFFENSE CODE....: 409     21:841 & 846 SEC 841-851
  OFF/CHG: 21:841(A)(1)&(B)(1)(B)&846 CONSPIRACY TO POSSESS WITH INTENT
           TO DISTRIBUTE & TO DISTRIBUTE CRACK COCAINE & COCAINE(SRT VIOL

   SENTENCE PROCEDURE.............: SUPERVISED RELEASE VIOLATION PLRA
   SENTENCE IMPOSED/TIME TO SERVE.:  40 MONTHS
   NEW SENTENCE IMPOSED...........:  24 MONTHS
   BASIS FOR CHANGE...............: COURT ORDER MODIFYING SENTENCE
   DATE OF OFFENSE................: 07-01-2010

  ------------------------CURRENT COMPUTATION NO: 030 -------------------------

  COMPUTATION 030 WAS LAST UPDATED ON 04-03-2020 AT DSC AUTOMATICALLY
  COMPUTATION CERTIFIED ON 04-03-2020 BY DESIG/SENTENCE COMPUTATION CTR

  THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
  CURRENT COMPUTATION 030: 030 010, 040 010

  DATE COMPUTATION BEGAN..........: 08-03-2017
  AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
  TOTAL TERM IN EFFECT............:  94 MONTHS
  TOTAL TERM IN EFFECT CONVERTED..:   7 YEARS      10 MONTHS
  AGGREGATED TERM OF SUPERVISION..:   3 YEARS
  EARLIEST DATE OF OFFENSE........: 07-01-2010

  JAIL CREDIT.....................: FROM DATE   THRU DATE
                                    02-04-2016  08-02-2017




  G0002      MORE PAGES TO FOLLOW . . .
```

Case 1:16-cr-00270-ARR  Document 74  Filed 05/11/20  Page 48 of 72 PageID #: 1061

```
 DSCEL         *       PUBLIC INFORMATION        *      04-03-2020
PAGE 004 OF 004 *            INMATE DATA          *      20:28:02
                         AS OF 04-03-2020


REGNO..: 18658-052 NAME: LEVY, GEORGE

                     RESP OF: 6-B
                     PHONE..: N/A          FAX: N/A
TOTAL PRIOR CREDIT TIME.........: 546
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 422
TOTAL GCT EARNED................: 216
STATUTORY RELEASE DATE PROJECTED: 10-08-2022
EXPIRATION FULL TERM DATE.......: 12-04-2023
TIME SERVED.....................:     4 YEARS      1 MONTHS      29 DAYS
PERCENTAGE OF FULL TERM SERVED..: 53.1

PROJECTED SATISFACTION DATE.....: 10-08-2022
PROJECTED SATISFACTION METHOD...: GCT REL




G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

# **EXHIBIT F**

```
1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------------------

4    UNITED STATES OF AMERICA,

5                  -versus-                        10-CR-512

6    GEORGE LEVY.

7    ----------------------------------------------------------

8                  TRANSCRIPT OF RESENTENCING

9    held in and for the United States District Court, Northern

10   District of New York, at the Federal Building, 15 Henry

11   Street, Binghamton, New York, on March 12, 2020, before

12   the HON. THOMAS J. McAVOY, Senior United States District

13   Court Judge, PRESIDING.

14

15   APPEARANCES:

16   FOR THE GOVERNMENT:

17   UNITED STATES ATTORNEY'S OFFICE

18   BY:  ANDREW BEATY, AUSA

19        Syracuse, New York

20

21   FOR THE DEFENDANT:

22   FEDERAL PUBLIC DEFENDER'S OFFICE

23   BY:  MELISSA TUOHEY, AFPD

24        Syracuse, New York

25
```

USA vs George Levy

```
 1            THE CLERK:  United States of America versus George
 2  Levy, 3:2010-CR-512.  Can we please have the appearances for
 3  the record.
 4            MR. BEATY:  Good afternoon, your Honor, Andrew
 5  Baety.
 6            THE COURT:  Good afternoon.
 7            MS. TUOHEY:  Good afternoon, your Honor, Melissa
 8  Tuohey on behalf of Mr. Levy who is also present.
 9            THE COURT:  Good afternoon, Ms. Tuohey; good
10  afternoon, Mr. Levy.
11            THE DEFENDANT:  Good afternoon, your Honor.
12            THE COURT:  All right.  I'd like to try maybe, just
13  quickly encapsulate, so we can realize why we're back here.
14            When I originally sentenced Mr. Levy on his
15  supervised release violations he had admitted to all of the
16  charges in the petition and the Court erroneously believed
17  that the underlying felony was a Grade A felony.  It turns
18  out it was Grade B.  When I looked at the Grade A and looked
19  at the corresponding sentencing range in the supervised
20  release violation area, I had a higher number than I would
21  have had I known it was a Grade B.  So the government caught
22  that, told the Circuit about it, Circuit sent it back and
23  said do it right, in words or substance, so that's why we are
24  here and hopefully I'm going to do it right this time because
25  I do realize it was a Grade B violation.  And I think what
```

USA vs George Levy

1    I've got to do here is calculate the correct Sentencing

2    Guidelines to sentence Mr. Levy and then listen to a little

3    bit about how things have been going since the last time we

4    were together and listen to a recommendation from the

5    government and defense and then sentence him.

6                      So, that's what I intend to do unless somebody

7    wants me to do something different.

8                      MS. TUOHEY:  No, your Honor.  That sounds great.

9                      MR. BEATY:  No problem, your Honor.

10                     THE COURT:  We don't have to go back over the

11   charges, we all know what they are.

12                     So, what would you like to say on behalf of

13   Mr. Levy before I sentence him?

14                     MS. TUOHEY:  Your Honor, I realize we're in a lower

15   guideline range now of 24 to 30 months.

16                     THE COURT:  That's right.

17                     MS. TUOHEY:  One of the issues at original

18   sentencing was that the Eastern District had wanted a

19   concurrent time for the new criminal conduct as well as the

20   supervised release violation in the Northern District.  This

21   Court you know, of course, doesn't have to follow that.  The

22   Court has discretion.  I think that one of the things that

23   wasn't really flushed out at the original sentencing is that

24   that guideline sentence that Mr. Levy received in the Eastern

25   District of New York, it was a guideline sentence, his range

USA vs George Levy

```
 1   was 70 to 87 months but it did account for his supervised

 2   release conduct here because --

 3             THE COURT:  Wait a minute.  How?  He was sentenced

 4   for possessing ammunition, right?

 5             MS. TUOHEY:  Yes.

 6             THE COURT:  That had nothing to do with what he did

 7   or didn't do up here.

 8             MS. TUOHEY:  In his criminal history calculation.

 9             THE COURT:  Oh, I see.

10             MS. TUOHEY:  He was originally Criminal History

11   Category IV but now in the Eastern District it was raised to

12   a Criminal History Category V because not only did it take

13   into account the Northern District offense but he received

14   two points for committing the new conduct while on supervised

15   release here.

16             THE COURT:  Okay.

17             MS. TUOHEY:  So, and I understand one of the

18   Court's concerns at the original sentencing was that he has

19   to pay the price here for violating his terms and conditions

20   and I just want to say that I think that 70-month term does

21   account for the new criminal conduct and that if the Court is

22   concerned still about his conduct on his supervised release

23   here, maybe the Court can consider sentencing him under a

24   Grade C range of 6 to 12 months or impose a concurrent or

25   partially concurrent term to account for that.
```

USA vs George Levy

```
 1              I think he spoke, you know, at the original
 2   sentencing how he's sorry that he's here again and he does
 3   want to do better.  He's been in for four-and-a-half years.
 4   It's a significant amount of time and he is ready to get home
 5   and he will have to be again on supervised release in the
 6   Eastern District for three years.  He'll still be under
 7   supervision.  I just think that another lengthy term will not
 8   satisfy the purposes of sentencing under 3553(a), your Honor.
 9              THE COURT:  All right.  Thank you, Miss Tuohey.
10   What does the government have to say?
11              MR. BEATY:  Your Honor, we agree that the
12   appropriate guideline range is the 24 to 30 month range and
13   the government, as it did before, continues to believe that a
14   guideline sentence is appropriate.  The government's view on
15   the consecutive versus concurrent issue is nothing has
16   changed since the Court first decided to impose a consecutive
17   sentence and that when the Court resentences, it should do
18   the same here.
19              The fact that the defendant's criminal history
20   in the Eastern District case was affected by his conviction
21   here and the fact he was already on supervised release
22   doesn't account for this particular violation.  It accounts
23   for the fact that he's on supervised release and the fact
24   he's previously violated that supervised release in this case
25   but not for these particular specifications that he pled
```

USA vs George Levy

1   guilty to.

2                    So, your Honor, the government's view,

3   essentially, it should be a very limited re-sentencing.  The

4   Court should consider the correct guidelines range,

5   articulate the 3553(a) factors it's considering and impose

6   whatever sentence that the Court feels appropriate.

7                    THE COURT:  All right.  Mr. Levy, what would you

8   like to say to me before I sentence you?

9                    THE DEFENDANT:  Your Honor, I've still been doing

10  the right things in prison to better myself working the job

11  corp.  I'm awaiting my time to get into RDAP, Residential

12  Drug Program.  I'm still counseling youths who come into

13  prison to try to better their life, get into a better

14  situation when they come home and just waiting my chance to

15  get back into society to do the right thing and a better man.

16                   THE COURT:  How you been doing in state prison?  I

17  know you've been working as you just told me.  Are you

18  getting into any trouble at all?

19                   THE DEFENDANT:  No, I haven't been in any trouble.

20  I haven't had one ticket.

21                   THE COURT:  No tickets.

22                   THE DEFENDANT:  I'm drug free, I'm clean and sober.

23  I'm actually working on finishing my sixth book.  I wrote two

24  screen plays, a cartoon.  I wrote three children books.  I'm

25  just ready, your Honor, I'm ready get out there and live a

USA vs George Levy

```
 1    good life.  Do the right thing.
 2              THE COURT:  I appreciate that.  Last time I think I
 3    told you it was gratifying to the Court that you were making
 4    the progress that you had then.  Well, now you're telling me
 5    there's even more progress for you to become and stay sober,
 6    not become involved in any more criminal activity and the
 7    Court should be aware of that, take cognizance of it when I
 8    sentence you, right?
 9              THE DEFENDANT:  Yes, sir.
10              THE COURT:  Okay.  The Court, at the direction of
11    the Second Circuit, the defendant's sentence has been
12    remanded in order for the Court to determine whether or not
13    the initial imprisonment range recommended by the guideline
14    revocation table in United States Sentencing Guidelines
15    7B1.4 was accurate.
16              Upon further review, the Court finds the
17    defendant's instant offense for which he was placed on
18    supervised release is a Class B felony after the retroactive
19    application of the Fair Sentencing Act; therefore, the Court
20    finds the violation constitutes a Grade A violation with a
21    Criminal History Category of IV.  Therefore, in accordance
22    with the policy statement set forth in United States
23    Sentencing Guidelines Chapter 7B1.1 and 4, the Court finds
24    your guideline range to be 24 to 30 months.
25              The Court, once again, is going to take
```

USA vs George Levy

1   cognizance of the efforts that you're making to improve

2   yourself.

3               So, upon your plea of guilty to the violation

4   of supervised release petition and pursuant to the Sentencing

5   Reform Act, it's the judgment of this Court that you're

6   hereby committed to the custody of the Bureau of Prisons for

7   24 months.  It's the bottom of the range.  This term of

8   imprisonment shall run consecutively to your term of

9   imprisonment imposed in the Eastern District of New York on

10  August 3, 2017.

11              In sentencing you to your violation of

12  supervised release, the Court is primarily considering your

13  breach of trust while taking into consideration, although to

14  a limited degree, the seriousness of the underlying violation

15  conduct as well as your criminal history.

16              The Court further acknowledges that it has the

17  option of imposing a concurrent sentence with the sentence

18  imposed by the Eastern District.  The Court believes a

19  sentence of imprisonment at the lower end to run

20  consecutively to the sentence imposed by the Eastern District

21  is warranted and necessary.

22              In conclusion, the Court finds the sentence

23  reflects the proper balancing of the factors ordered in 18 US

24  Code Section 3553(a), including your personality

25  characteristics, seriousness of the offense, protection of

USA vs George Levy

1    the public, recognition of the criminal activity and it's

2    sufficient but not greater than necessary to comply with the

3    purpose of sentencing.

4              The Court will not impose a term of supervised

5    release to follow.  All other terms in the judgment dated

6    September 27, 2018 shall remain.

7              Both you and the government have the right to

8    appeal this sentence under certain limited circumstances and

9    if you wish to appeal, you must file your appeal within 14

10   days of the date of this sentence.

11             There's nothing to dismiss, right?

12        MS. TUOHEY:  No.

13        MR. BEATY:  That's correct, your Honor.

14        THE COURT:  Anything further from defense?

15        MS. TUOHEY:  No.  Thank you, your Honor.

16        THE COURT:  Mr. Levy, this time I hope I don't ever

17   see you again.

18        THE DEFENDANT:  Thank you, your Honor.

19        THE COURT:  Just keep doing the good work.

20        THE DEFENDANT:  I will.

21        THE COURT:  Court stands adjourned.

22        MR. BEATY:  Thank you, Judge.

23             (Court stands adjourned)

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, VICKY A. THELEMAN, Federal Official

6    Realtime Court Reporter, in and for the United

7    States District Court for the Northern District of

8    New York, do hereby certify that pursuant to Section

9    753, Title 28 United States Code that the foregoing

10   is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the

14   Judicial Conference of the United States.

15

16

17                             /s/ Vicky A. Theleman

18                        VICKY A. THELEMAN, RPR, CRR

19                        US District Court - NDNY

20

21

22   Dated:  April 30, 2020.

23

24

25
```

# **EXHIBIT G**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __5/8/20__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

United States

–v–

Alberto Pena,

Defendant.

---

15-cr-551 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Alberto Pena is currently incarcerated at FCI Fort Dix in New Jersey, which is the site of a significant COVID-19 outbreak. He has served approximately two-thirds of his 84-month sentence and is eligible for release within one year. Mr. Pena suffers from a number of serious medical issues that put him at high risk of severe medical consequences were he to contract the virus. As a result, he has filed an administrative request with the Bureau of Prisons and an emergency motion for compassionate release, pursuant to 18 U.S.C. § 3582(c), with this Court. For the reasons that follow, Mr. Pena's motion for compassionate release is GRANTED, and the Government is ordered to release Mr. Pena from custody immediately.

## I.      BACKGROUND

### A.  Underlying Criminal Charges and Proceedings

In August 2015, the Government charged Mr. Pena in a multi-defendant, two-count indictment, alleging that he helped orchestrate a violent armed robbery that terrorized multiple victims, including children. Dkt. No. 1. Mr. Pena was not one of the robbers; he did not physically participate in the robbery. Instead, Mr. Pena's role was as "an organizer." Sentencing. Tr., Dkt. No. 273, at 44. That is not to minimize his importance in the robbery; as the Court noted at sentencing, without Mr. Pena, "[the robbery] would not have occurred." *Id.*

(also describing Mr. Pena as a "but-for cause" of the robbery).  In addition, Mr. Pena knew five people would participate in the robbery, knew or should have known about the existence of weapons, and knew that there were young children in the home.  *Id.*; *see also* Change of Plea Tr., Dkt. No. 173, at 21 (Mr. Pena: "I knew that the other person would threaten to use force to take the property of the people in the house.").

Following his indictment, the Magistrate Judge determined that incarcerating Mr. Pena was not necessary to secure the safety of the community, so he was released on bail pending trial.  *See* Minute Entries dated August 18, 2015.  In February 2016, Mr. Pena pleaded guilty to committing Hobbs Act robbery.  Over one year later, in April 2017, Mr. Pena appeared before the Court for sentencing.  The Court determined that the Sentencing Guidelines Range applicable to Mr. Pena's conduct was 151 to 188 months' (about twelve to sixteen years') imprisonment.  Sentencing Tr. at 24.  Two of the robbery's victims spoke at Mr. Pena's sentencing.  Each testified that the robbery was deeply traumatic for them and their families, and that the violent incident had caused irreversible pain and suffering.  *See* Sentencing Tr. at 40–41.  The Court sentenced Mr. Pena to 84 months' imprisonment to be followed by three years of supervised release.  Sentencing Tr. at 46–47; Dkt. No. 276 (Judgment).  The substantial downward variance was a result of the Court's assessment that despite the violent nature of this offense, the Defendant was not likely to recidivate.  *See* Sentencing Tr. at 45 (the Court concluding that Mr. Pena's limited criminal history, involvement in his community, charitable acts, and substantial ties to his family "all speak to his character and, importantly, I think, a very decreased likelihood of recidivism going forward.").

**B.  Mr. Pena's Motion for Compassionate Release**

Mr. Pena is currently serving his sentence at FCI Fort Dix in New Jersey.  He is

scheduled for release in February 2022, although the Bureau of Prisons has authority to transfer him to home confinement as early as August 2021.  *See* Pena Br., Dkt. No. 332, at 5.  On April 30, 2020, Mr. Pena filed an emergency motion for compassionate release.  Dkt. No. 332.  About one week before, Mr. Pena had submitted a similar request to the warden of his prison.  Dkt. No. 332, Ex. C.  Mr. Pena seeks compassionate release because his age and underlying health conditions make him highly vulnerable to COVID-19.  The Government opposes Mr. Pena's motion.  *See* Gov't Br., Dkt. No. 334, at 1.

## II.    MR. PENA IS ENTITLED TO COMPASSIONATE RELEASE

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed,' 18 U.S.C. § 3582(c); but the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  The compassionate-release statute creates one such exception: It allows a court to "reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if "it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).  Under the recently enacted First Step Act, defendants serving their sentence may move the Court for compassionate release.  *Gotti*, 2020 WL 497897, at *2; *United States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1673244, at *2 (S.D.N.Y. Apr. 6, 2020).  Mr. Pena has filed such a motion.

### A.  The Court Excuses Mr. Pena's Failure to Exhaust

Before a compassionate-release motion can be considered on the merits, the defendant must exhaust administrative remedies.  The First Step Act provides that courts can consider compassionate-release motions brought by incarcerated defendants only if one of two requirements is met.  First, courts can consider such motions "after the defendant has fully

3

exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

on the defendant's behalf."  18 U.S.C. § 3582(c)(1)(A).  Second, courts can consider such

motions after "the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility."  *Id.*  The earlier of these two dates controls; as soon as one of these

requirements is met, the exhaustion requirement is satisfied.  *Id.*

Here, the parties agree that neither requirement is met.  Mr. Pena initiated the Bureau of

Prisons' administrative process nine days before filing his motion in this Court.  On April 21,

2020, he requested that the warden of his facility file a compassionate-release motion on his

behalf.  Dkt. No. 332, Ex. C.  This is the first step in the BOP's administrative process.  *See*

*generally* 28 C.F.R. § 571.63 (outlining this procedure).  The warden has yet to rule on Mr.

Pena's request, so he has not "fully exhausted all administrative rights."  18 U.S.C.

§ 3582(c)(1)(A).  And 30 days have not elapsed since he made the request.  So Mr. Pena has not

exhausted his remedies.

However, Mr. Pena urges the Court to waive compliance with the exhaustion

requirement.  As the Court discussed at length in its recent decision in *United States v. Scparta*,

the First Step Act's exhaustion requirement is not jurisdictional, but instead a claims-processing

rule.  A defendant's lack of compliance therefore does not strip the Court of power to grant

compassionate release.  No. 18-CR-578 (AJN), 2020 WL 1910481, at *4 (S.D.N.Y. Apr. 20,

2020).  The Second Circuit has also held that such requirements generally admit of equitable

exceptions, such as waiver, estoppel, and futility.  *Id.* at *5; *see Paese v. Hartford Life & Acc.*

*Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006).  To determine whether a claims-processing rule is

subject to such exceptions, courts look to statutory text and history.  *See McCarthy v. Madigan*,

503 U.S. 140, 144 (1992); *see, e.g.*, *United States v. Russo*, No. 16-cr-141 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020).

The First Step Act's plain text creates "an exhaustion requirement like no other of which the Court is aware," in that it contains elements of both a traditional exhaustion scheme and a timeliness requirement. *Scparta*, 2020 WL 1910481, at *6; *see also Russo*, 2020 WL 1862294, at *6. The Supreme Court and Second Circuit have often applied equitable exceptions to otherwise unforgiving time requirements, strongly supporting the conclusion that they apply here too. *See, e.g.*, *Holland v. Florida*, 560 U.S. 631, 649 (2010) (applying equitable exception even though text did not permit such an exception); *Paese*, 449 F.3d at 443. Moreover, the Court also considers the exhaustion provision's statutory title, "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-391, 132 Stat. 5339 (2018). Without the application of equitable exceptions, prisoners bringing compassionate-release motions due to COVID-19 might *never* obtain timely judicial review before the virus takes its toll. Such an interpretation, therefore, would serve neither of the provision's stated aims. Finally, the statute's legislative history, which the Supreme Court has described as "paramount" to this inquiry, makes clear that "Congress specifically designed the First Step Act to result in expeditious review of prisoner applications and to improve the health and safety of inmates, prison staff, and the community." *Scparta*, 2020 WL 1910481, at *7 (citing *McCarthy*, 503 U.S. at 144, and H.R. Rep. 115-699 at 22.) Leaving Mr. Pena in administrative limbo while his life is at risk would be contrary to Congress's express purpose.

In sum, the First Step Act's text, history, and structure all support the Court's conclusion that the statute's exhaustion requirement is amenable to equitable exceptions. And here, waiting for Mr. Pena to exhaust his remedies would both be futile and cause him irreparable harm. FCI

Fort Dix, the complex at which Mr. Pena is currently held, is the most heavily populated BOP

facility and has had 43 confirmed cases of COVID-19. *See* Bureau of Prisons, COVID-19,

https://www.bop.gov/coronavirus/ (last accessed May 6, 2020). For Mr. Pena to wait an

additional three weeks (until 30 days lapse and the exhaustion requirement is satisfied) could be

the difference between life and death—and if he falls seriously ill or dies, he will have suffered

irreparable harm and his motion seeking release would be futile. *Accord Perez*, 2020 WL

1546422, at *3 ("Here, even a few weeks' delay carries the risk of catastrophic health

consequences for Perez. The Court concludes that requiring him to exhaust administrative

remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic,

would result in undue prejudice and render exhaustion of the full BOP administrative process

both futile and inadequate."). For these reasons, the Court excuses Mr. Pena's failure to exhaust

administrative remedies.

### B. The Defendant Has Satisfied All Substantive Requirements For Compassionate Release

Given that administrative exhaustion does not bar Mr. Pena's request, the Court now

considers the merits of his motion. To award Mr. Pena the relief he seeks, the Court must find

that "extraordinary and compelling reasons warrant" compassionate release. 18 U.S.C.

§ 3582(c)(1)(A)(i). The Court must also consider the factors set forth in 18 U.S.C. § 3553(a).

*Id.* § 3582(c)(1)(A). And the Court must find that release is consistent with the Sentencing

Commission's policy statements. *Id.* § 3582(c)(1)(A)(i).

The Court begins with the factors set out in 18 U.S.C. § 3553(a). Because this Court

sentenced Mr. Pena, the Court is intimately familiar with how these factors apply to his

circumstances. As the Court noted at Mr. Pena's sentencing, the underlying conduct here was

heinous. The armed robbery that Mr. Pena helped to organize was violent, traumatized

numerous victims including children, and resulted in the theft of tens of thousands of dollars. The robbery would not have occurred were it not for Mr. Pena's involvement. *See* Sentencing Tr. at 44. Nonetheless, the Court also noted that Mr. Pena pleaded guilty, accepted responsibility for his conduct in both written submissions and oral statements before the Court, and expressed genuine remorse for his involvement in the scheme. *Id.* at 45–46. And the Court noted "that [Mr. Pena] did not himself physically participate in this conduct . . . [which] suggests some diminished level of culpability" as compared to his co-defendants. *Id.* at 44. Moreover, Mr. Pena had a limited criminal history before the conduct here, and had never before been convicted of a violent offense. *See* PSR ¶¶ 44–49; *see also* Sentencing Tr. at 36 (noting Mr. Pena's "lack of any other criminal history or use of violence in the past."). In other words, "the criminal conduct [in this case] appears to be a departure from [Mr. Pena's] otherwise nonviolent and productive life." Sentencing Tr. at 45.

The Court's substantial sentence of 84 months reflected the seriousness of Mr. Pena's offense and these mitigating factors, and was at the time sufficient, but no greater than, necessary to achieve the purposes of sentencing. But the Court's analysis is different in current circumstances. Due to the COVID-19 pandemic, the "history and characteristics of the defendant" and the "need . . . to provide the defendant with needed . . . medical care," § 3553(a), now weigh heavily in favor of Mr. Pena's release, given the health risk that continued incarceration poses to him. Mr. Pena is sixty-years old. He has several underlying health conditions that increase his vulnerability to COVID-19 infection and, if infected, to the risk of serious injury or death. Specifically, Mr. Pena suffers from hypertension and hyperlipdermia, among other ailments. *See* Dkt. No. 332, Ex. B, at 41 (Mr. Pena's medical records). The Centers for Disease Control and Prevention has identified hypertension as a comorbidity that

increases the likelihood of serious risk from COVID-19. *See* Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease, Centers for Disease Control and Prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html. This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension, like Mr. Pena. *See, e.g.*, *Scparta*, 2020 WL 1910481, at *9; *see also Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (noting that hypertension increases risk of harm from COVID-19, taking "judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality," and citing information from the CDC). Mr. Pena also takes several medications to control his hypertension and reduce his risk of heart attack. He persuasively demonstrates, and the Government does not dispute, that these medications increase his risk from COVID-19. Pena Br. at 11–12, 20–21 (citing data from the CDC).

Mr. Pena has now served more than two-thirds of his sentence, and may be transferred to home confinement in a little more than one year from now. The time he has served in prison has already achieved much of the original sentence's retributive, deterrent, and incapacitative purpose. And Mr. Pena's continued detention now poses him imminent danger of serious injury and death—a circumstance that the Court never considered when imposing its sentence. Having reconsidered the § 3553(a) factors, the Court thus concludes that they entitle Mr. Pena to compassionate release.

The Court next considers whether "extraordinary and compelling reasons warrant such a reduction [in sentence] . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). "Congress

tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence." *United States v. Butler*, No. 19-cr-834 (PAE), 2020 WL 1689778, at *1 (S.D.N.Y. Apr. 7, 2020). The applicable policy statement, U.S.S.G. § 1B1.13, outlines four circumstances that constitute "extraordinary and compelling reasons" and thus warrant a sentence reduction.[1] One of these circumstance exists where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A). The policy statement also requires that the defendant not pose "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

As this Court has explained, the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals. *See, e.g.*, *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020); *Gross*, 2020 WL 1673244, at *3 ("we are not currently living under normal circumstances"); *accord United States v. Nkanga*, No. 18-cr-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) ("The country faces unprecedented challenges from the novel Coronavirus pandemic. Those detained in jails and prisons face particularly grave danger."). In these exigent circumstances, the 30-day exhaustion period may be far too long—"each day, perhaps each hour, that elapses 'threatens incarcerated defendants with greater peril.'" *Gross*, 2020 WL 1673244, at *3 (quoting *United States v. Russo*, No. 16-cr-441 (LJL), Dkt. No. 54, at 5 (S.D.N.Y. Apr. 3, 2020)). This is true even though, as the

---

[1] U.S.S.G. § 1B1.13(1)(A) references only "a motion of the Director of the Bureau of Prisons" because it has not yet been updated to reflect the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, which allows defendants independently to seek compassionate release relief from federal courts. *Ebbers*, 2020 WL 91399, at **1, 4. The majority of courts have concluded that since passage of the First Step Act, courts may make their own assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction. *See, e.g., United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) (citing cases).

Government proffers, the Bureau of Prisons has taken significant action to reduce the risk COVID-19 poses to prisoners.  Gov't Br. at 6–7.  The Court lauds these efforts and urges continued and increased vigilance.  But even with these new policies, Mr. Pena continues to face extraordinary danger from COVID-19 so long as he remains in custody.  As discussed, Mr. Pena suffers from multiple medical issues that make him especially vulnerable to the virus.

The Court must also consider whether Mr. Pena poses "a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  To be sure, the crime organized by Mr. Pena was extremely violent.  However, Mr. Pena did not play a physical role in the robbery.  And at the time of the crime, Mr. Pena was suffering from substance-abuse and severe mental-health problems, in large part caused by the sudden and untimely death of his son.  *See* PSR ¶¶ 65–70.  The Government does not dispute that for decades before the robbery, Mr. Pena lived a law-abiding life and contributed meaningfully to his community.  The same is true of Mr. Pena's conduct since the crime.  Following his arrest, Mr. Pena was released on bail, and he complied with the requirements of home detention and electronic monitoring.  And while in custody, Mr. Pena has completed drug and alcohol rehabilitation programming, obtained mental-health treatment, and received medication to treat his mental-health issues.  *See* Pena Br. 24–25.  He has also spent his time in prison productively, including by working in food services.  *Id.*  Crucially, Mr. Pena has not received a *single* disciplinary infraction while in custody over the past five years.  *See* Dkt. No. 332, Ex. A (Mr. Pena's disciplinary record).  Indeed, as the Government recognizes, the Bureau of Prisons has confined Mr. Pena in a low-security facility.  Gov't Br. at 8.   The aberrational nature of his crime, coupled with Mr. Pena's advanced age, substantial progress in treating his mental-health and substance-abuse problems, and outstanding record while in custody, convince the Court, which has close familiarity with all relevant facts,

that he does not now pose a danger to the community.

These factors taken together are extraordinary and compelling, and are therefore sufficient to warrant compassionate release. *Accord United States v. Sawics*, No. 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (concluding that, because the defendant suffered from hypertension, he was vulnerable to COVID-19 and thus "the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release."). In sum, the Court concludes that Mr. Pena has satisfied all requirements for compassionate release.

## III.   CONCLUSION

For the reasons stated above, the Court GRANTS Mr. Pena's motion for compassionate release. The Court therefore RESENTENCES Mr. Pena to time served plus 36 months of supervised release under the conditions in the original judgment. The mandatory conditions, standard conditions, and special conditions of supervised release from Mr. Pena's original sentence are hereby imposed. The Court also imposes an additional condition of supervised release: Mr. Pena is ordered to serve the remaining portion of his original term of imprisonment, as calculated by the Bureau of Prisons, under home confinement.

The Government is ORDERED to release Mr. Pena from custody immediately. It is FURTHER ORDERED that the parties shall meet and confer and submit a proposed order governing the conditions of Mr. Pena's release, including his period of 14 days of self-isolation, no later than May 9, 2020 at 12:00 P.M.

SO ORDERED.

Dated:  May 8, 2020
        New York, New York

11

_____
ALISON J. NATHAN
United States District Judge