UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 16-cr-270 (ARR) |
| — against — | |
| | **Not for print or electronic publication** |
| GEORGE LEVY, | |
| Defendant. | **Opinion & Order** |

ROSS, United States District Judge:

The defendant, George Levy, moves through counsel for compassionate release from prison. The government opposes. For the reasons set forth below, the instant motion is stayed.

## BACKGROUND

In March 2011, defendant George Levy pleaded guilty before the Honorable Thomas J. McAvoy, United States District Judge, in the Northern District of New York to one count of conspiracy to possess with intent to distribute cocaine. *See* Min. Entry, Mar. 16, 2011, Docket No. 3:10-cr-512 (N.D.N.Y.) ("N.D.N.Y. Dkt."); Indictment, Oct. 27, 2010, N.D.N.Y. Dkt. ECF No. 18. Judge McAvoy sentenced Levy to forty-one months' imprisonment and four years of supervised release. Min. Entry, Sept. 6, 2012, N.D.N.Y. Dkt. ECF No. 75. In May 2014, Levy admitted to violating the conditions of his term of supervised release by leaving the district without permission and by failing to report contact with law enforcement officers; Judge McAvoy revoked Levy's supervised release and sentenced him to eight months' imprisonment to be followed by four years of supervised release. *See* J. in Crim. Case, May 9, 2014, N.D.N.Y. Dkt. ECF No. 91.

Upon his release from prison, Levy violated supervised release again. In October 2015, a

1

warrant issued based on Levy's probation officer's belief that Levy had violated numerous conditions of supervision. *See* Am. Pet. for Warrant or Summons 1–3, N.D.N.Y. Dkt. ECF No. 117. Levy ultimately admitted guilt to several violations, including failure to secure employment, use of illegal substances, failure to perform community service, failure to participate in drug testing and treatment, and alcohol use. *See* J. in Crim. Case, Oct. 5, 2018, N.D.N.Y. Dkt. ECF No. 121 ("Oct. 2018 J.").

In February 2016—while the October 2015 warrant on the violation was outstanding—Levy was arrested again for conduct that amounted to additional violations of supervised release. New York City Police Department officers arrested Levy in Brooklyn for possession of a handgun, which they found under the passenger seat of a parked car next to which Levy was standing. *See* E.D.N.Y. Presentence Report ¶¶ 4–6, 10 ("PSR").[1] Levy admitted guilt before Judge McAvoy to two additional violations—in addition to those underlying the October 2015 warrant—for leaving the Northern District without authorization and incurring a new felony arrest. *See* Oct. 2018 J. Levy was also indicted in the Eastern District of New York on a new charge of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *See* Indictment ¶ 1, May 18, 2016, Docket No. 16-cr-270 (E.D.N.Y.) ("E.D.N.Y. Dkt."), ECF No. 9.[2] He pleaded guilty to this charge. *See* Min. Entry, Dec. 9, 2016, E.D.N.Y. Dkt. ECF No. 39.

In the Eastern District case, Judge Weinstein sentenced Levy to seventy months' imprisonment to be followed by three years of supervised release. *See* J., Aug. 17, 2017, E.D.N.Y.

---

[1] This PSR does not appear on the docket, but defense counsel has provided it to the court and to the government. Upon the release of this opinion, defense counsel is instructed to file the PSR on the E.D.N.Y. docket under seal.

[2] The Eastern District case was initially assigned to the Honorable Jack B. Weinstein, United States District Judge, who presided until his recent retirement. This case was reassigned to me after Judge Weinstein retired.

Dkt. ECF No. 52. In the Northern District case—on the violations of supervised release—Judge McAvoy initially sentenced Levy to forty months' imprisonment, to be served consecutively to the seventy-month sentence that Judge Weinstein imposed. *See* Oct. 2018 J. 2, N.D.N.Y. Dkt. ECF No. 121. However, after Levy appealed, the Second Circuit remanded for Judge McAvoy to consider whether a miscalculation had impacted Levy's guidelines range. *See* Mandate, Nov. 13, 2019, N.D.N.Y. Dkt. ECF No. 132. In March 2020, Judge McAvoy resentenced Levy to twenty-four months' imprisonment, to be served consecutively to the seventy-month sentence in the Eastern District. *See* Am. J. on Revocation 3, Mar. 17, 2020, N.D.N.Y. Dkt. ECF No. 142.

At the time of his resentencing, Levy had begun serving his sentence at FCI Fort Dix. *See* Order & Writ of Habeas Corpus 1, N.D.N.Y. Dkt. ECF No. 141. Levy was produced to the Northern District for his resentencing proceeding by writ of habeas corpus *ad prosequendum*. *See id.* at 2. As such, he was placed at the Broome County Correctional Facility (the "Broome County Jail" or "BCCF"), a local jail that is outside the purview of the Bureau of Prisons ("BOP"). *See* Def.'s Mot. for Compassionate Release 2, E.D.N.Y. Dkt. ECF No. 66 ("Def.'s Mot."). Because the BOP has restricted non-essential inmate movement because of the COVID-19 pandemic, Levy remains at the Broome County Jail. *See* U.S. Dep't of Just. Fed. BOP, *Bureau of Prisons Update on COVID-19* at 1 (Mar. 24, 2020), https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf; Government's Mem. of Law in Opp. to Def's Mot 8 n.4, E.D.N.Y. Dkt. ECF No. 68 ("Gov't Resp."); Def.'s Mot. 2.

In sum, Levy is currently detained at the Broome County Jail, serving seventy months on the Eastern District felon-in-possession case in addition to twenty-four months on the Northern District violation of supervised release. As of early April 2020, he had served 53.1% of the total

3

term of imprisonment imposed by both Judge Weinstein and Judge McAvoy. *See* Inmate Data Def.'s Mot. Ex. A at 4, E.D.N.Y. Dkt. ECF No. 66. Assuming he will receive good time credit—which he is on track to receive—his projected release date is in October 2022. *Id.* at 1. He will be eligible for release to home detention in April 2022. *Id.* at 2.[3]

However, Levy has served approximately 86% of the sentence that Judge Weinstein imposed in this district, factoring in good-time credit. A defendant subject to a seventy-month sentence and who receives good-time credit would actually serve approximately fifty-nine and a half months. Taking into account the jail credit that Levy is receiving, he has served approximately fifty-one months to date. *See id.* at 3. Put differently, considering the sentence that Judge Weinstein imposed in this district—the only sentence that I have the power to reduce—in isolation, Levy has approximately eight months remaining to serve.

Levy now moves for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), arguing that the presence of COVID-19 at the Broome County Jail, combined with his particular susceptibility to the virus because he had a heart attack in 2015 and has a history of hypertension, compels his release to home confinement. *See* Def.'s Mot. 2–3. The government

---

[3] The defense asserts that the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") expanded the maximum amount of time that a prisoner may spend in home confinement: "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement . . . ." CARES Act § 12003(b), Pub. L. No. 116-136, 134 Stat. 281 (2020); *see* Def.'s Mot. 4. Attorney General William Barr made the requisite "finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons" on April 3, 2020, thereby triggering the BOP's authority to expand the amount of time that a prisoner may spend in home confinement. William Barr, Mem. for Director of BOP at 1 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download. As such, according to Levy, he could, in theory, qualify for release to home detention before April 2022. *See* Def.'s Mot. 4–5. However, Levy argues that because he is not currently detained at a BOP facility, he cannot request that the BOP transfer him to home confinement. *See id.* at 5. Because Levy has petitioned me for relief under the First Step Act, and not under the CARES Act, I do not decide whether any relief is available to him under the CARES Act.

opposes. Levy has also moved for compassionate release in the Northern District of New York. *See* Mot. for Compassionate Release, N.D.N.Y. Dkt. ECF No. 146.

## DISCUSSION

The First Step Act allows prisoners to move for compassionate release when "extraordinary and compelling reasons warrant" such release. 18 U.S.C. § 3582(c)(1)(A)(i). The statute reads:

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). Thus, there are four prerequisites to a court's granting compassionate release under the First Step Act. First, the defendant must have exhausted his administrative rights with the Bureau of Prisons ("BOP"). § 3582(c)(1)(A). Second, the court must find that "extraordinary and compelling reasons warrant" release. § 3582(c)(1)(A)(i). Third, the court must consider the factors set forth in 18 U.S.C. § 3553(a). § 3582(c)(1)(A). Fourth, the court must find that release is consistent with the Sentencing Commission's policy statements. § 3582(c)(1)(A)(i).

### I. Exhaustion

The First Step Act requires that before a court may grant compassionate release, the defendant must have either (1) "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) allowed thirty days to lapse from the time of the prison warden's receipt of the defendant's request to bring a motion on his behalf, whichever is earlier. § 3582(c)(1)(A). In this case, Levy has not petitioned the BOP for

5

relief. However, Levy is not in BOP custody because he is detained at the Broome County Jail, which is not a BOP facility. As such, Levy argues that there is no warden with any authority in the federal compassionate release process to whom he could address the request that the First Step Act requires. *See* Def.'s Mot. 8. The government agrees that Levy is not presently in BOP custody, and, accordingly, it "does not assert exhaustion as a bar to the present motion." Gov't Resp. 8 n.4.

Thus, given that the government does not argue that exhaustion bars Levy's motion, I conclude that the exhaustion requirement is either satisfied or excused in this case. *See United States v. Van Dyke*, No. 2:15-CR-0025-JLQ-1, 2020 WL 1811346, at *2 (E.D. Wash. Apr. 8, 2020), *adhered to on reconsideration in* 2020 WL 1845553 (E.D. Wash. Apr. 10, 2020) (finding that defendant had "effectively exhausted" administrative remedies when he was housed at county jail and all transports to BOP custody had been ceased because of COVID-19); *see also United States v. Hernandez*, No. 18 Cr. 834-04 (PAE), 2020 WL 1684062, at *2 (S.D.N.Y. Apr. 2, 2020) (concluding, after both parties agreed, that exhaustion was satisfied when BOP could not evaluate defendant for compassionate release because defendant was in custody of United States Marshals at private facility and not in BOP custody); *United States v. Jepsen*, No. 3:19-cv-00073(VLB), 2020 WL 1640232, at *3 (D. Conn. Apr. 1, 2020) ("Mr. Jepsen is essentially caught in a 'Catch-22'; neither the warden at Wyatt nor the BoP will consider his request because of his designation to Wyatt, a non-BoP facility. Accordingly, the Court considers the merits of his motion."). I will not conclude that, in the middle of a public health emergency, the statute mandates that Levy wait for an indefinite period of time to be transferred to a BOP facility, only to then petition the warden of that facility for his release and potentially wait thirty additional days, before he may bring a motion in this court, especially absent an argument from the government that he must do so. *See Van Dyke*, 2020 WL 1811346, at *2.

## II. Extraordinary and Compelling Reasons for Release

In order for a court to grant compassionate release, it must find that "extraordinary and compelling reasons warrant" such release. 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission has issued a Policy Statement that defines "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018) ("USSG"); *see United States v. Ebbers*, No. (S4) 02-CR-1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Bellamy*, No. 15-165(8) (JRT/LIB), 2019 WL 3340699, at *2 (D. Minn. July 25, 2019). Under this Policy Statement, "extraordinary and compelling reasons exist" when "[t]he defendant is suffering from a terminal illness[.]" USSG § 1B1.13 cmt. n.1(A)(i). Alternatively, extraordinary and compelling reasons exist when "[t]he defendant is . . . suffering from a serious physical or medical condition, . . . suffering from a serious functional or cognitive impairment, or . . . experiencing deteriorating physical or mental health because of the aging process[.]" USSG § 1B1.13 cmt. n.1(A)(ii). Such a condition must "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," and it must be one "from which [the defendant] is not expected to recover." *Id.* Further, extraordinary and compelling reasons may instead exist based on the defendant's advanced age—requiring that the defendant be at least sixty-five years old—or based on certain family circumstances. *Id.* cmt. n.1(B)–(C). Finally, extraordinary and compelling reasons may exist if, "[a]s determined by the Director of the Bureau of Prisons, there exists . . . an extraordinary and compelling reason other than, or in combination with," the other listed reasons in the Guideline. *Id.* cmt. n.1(D). "[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* cmt. n.2.

This Policy Statement is "anachronistic" because it pre-dates the First Step Act itself.

7

*Ebbers*, 2020 WL 91399, at *4. Some district courts have concluded that the court may make an "independent assessment" of whether "extraordinary and compelling reasons" for release are present, looking to the Policy Statement only for "guidance." *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also United States v. Young*, No. 2:00-cr-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release."). *But see Ebbers*, 2020 WL 91399, at *4 (deeming Policy Statement "helpful in defining a vague standard" and concluding that its "descriptions of 'extraordinary and compelling reasons' remain current.").

In this case, Levy had a heart attack in 2015. His medical records obtained from Binghamton General Hospital, where he was evaluated and treated, confirm as much. *See* Binghamton Medical Records Def.'s Reply Ex. A at 1, 36, 45, 84, E.D.N.Y. Dkt. ECF No. 75-1 ("Binghamton Records") (indicating that Levy experienced "non-ST elevation myocardial infarction[] with elevated markers and EKG changes," "[a]cute anteroseptal myocardial infarction," "[n]on-Q-wave anterolateral infarction with no specific coronary blockage," "[a]cute myocardial infarction," and/or "[s]ubendocardial infarction"). A doctor performed "[l]eft heart catheterization and coronary angiography" and found "[m]ildly to moderately elevated left ventricular end-diastolic pressure." *Id.* at 21–22. In addition, a doctor prescribed aspirin, metoprolol, and statins. *Id.* at 36. The Binghamton Records are generally consistent with Levy's PSR and with his BOP medical records, all of which document that Levy reported suffering a mild heart attack of some form in 2015, although the details of the surrounding circumstances and the treatment that he received do vary. *See* PSR ¶ 67; BOP Medical Records Excerpts Gov't Ex. A at

8

2, 25, 27, 36, 47, E.D.N.Y. Dkt. ECF No. 70-1 ("BOP Records Excerpts").[4] BOP records also show that Levy had an "abnormal ECG" with an "unconfirmed diagnosis" in April 2018. Full BOP Medical Records Gov't Ex. B at 131, E.D.N.Y. Dkt. ECF No. 70-2 ("Full BOP Records").[5] In addition, BOP providers identified Levy as having "[h]eart disease, unspecified" in November 2018 and prescribed him aspirin. *Id.* at 210, 272–73.

While I cannot fully understand the details of Levy's medical history without explanation from an expert witness, I am satisfied that Levy suffered a heart attack approximately five years ago. His medical records show some continuing heart disease since then, though the details are beyond my expertise. Levy was thirty-two years old at the time of the heart attack, Binghamton Records 21, and is approximately thirty-seven today, *see* Inmate Data 1.

In addition, Levy's blood pressure has been elevated, and sometimes hypertensive, at various times since his heart attack in 2015. The Mayo Clinic categorizes blood pressure readings as follows:

> **Normal blood pressure.** Your blood pressure is normal if it's below 120/80 mm Hg.
> **Elevated blood pressure.** Elevated blood pressure is a systolic pressure ranging from 120 to 129 mm Hg and a diastolic pressure below 80 mm Hg. Elevated blood pressure tends to get worse over time unless steps are taken to control blood pressure.
> **Stage 1 hypertension.** Stage 1 hypertension is a systolic pressure ranging from 130 to 139 mm Hg or a diastolic pressure ranging from 80 to 89 mm Hg.
> **Stage 2 hypertension.** More severe hypertension, stage 2 hypertension is a systolic pressure of 140 mm Hg or higher or a diastolic pressure of 90 mm Hg or higher.

---

[4] For clarity, citations to page numbers within the BOP medical records refer to the page numbers as designated on the ECF headers.

[5] The defense points to various other details in Levy's BOP records, such as the fact that his provider in April 2018 noted "probable left ventricular hypertrophy," Full BOP Records 131, which the Mayo Clinic defines as an "enlargement and thickening" of the heart's left ventricle, Mayo Clinic, *Left ventricular hypertrophy* (last updated June 13, 2018), https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/symptoms-causes/syc-20374314, and that a February 2019 ECG led to various findings, *see* Full BOP Records 333. Interpreting the significance of these findings is beyond my expertise.

Mayo Clinic, *High blood pressure (hypertension)* (last updated May 12, 2018), https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417. One page of the Binghamton Records shows that Levy had "[a]ccelerated blood pressure" when he was evaluated for his heart attack. Binghamton Records 36. Elsewhere, the Binghamton Records describe Levy as having "[e]ssential hypertension, unspecified benign or malignant[.]" *Id.* at 1. In addition, BOP records show that Levy has had blood pressure readings in the hypertensive range numerous times since his incarceration in 2016. *See* BOP Records Excerpts 55; Full BOP Records 140, 158, 209, 212, 214; Suppl. BOP Records Def.'s Reply Ex. B at 57, E.D.N.Y. Dkt. ECF No. 75-2. Recently, on January 22, 2020, Levy's blood pressure was 154/97—hypertensive. *See* Full BOP Records 384. The defense asserts that the metoprolol that Levy was prescribed is "a blood pressure medication." Def.'s Reply 5, ECF No. 74. Still, the defense acknowledges that Levy has also had normal blood pressure readings at times, though counsel does not cite to any such particular readings in the record. *See* Def.'s Reply 5 n.7.

      The presence of COVID-19 within the Broome County Jail poses an additional risk to Levy. The parties dispute the extent of that risk. While the defendant cites Broome County Executive Jason Garnar's designation of the jail as a "hotspot" for the virus, with at least four inmates and six corrections officers having tested positive as of April 7, 2020, the government points to the efforts that the facility has taken to mitigate the virus's spread. *See County Executive Jason Garnar addresses two biggest "hot spots" for the virus in Broome County*, Binghamton homepage (last updated Apr. 7, 2020), https://www.binghamtonhomepage.com/local-news-2/county-executive-jason-garnar-addresses-two-biggest-hot-spots-for-the-virus-in-broome-county; Gov't Resp. 15–19; Def.'s Mot. 2. Even assuming that the jail is, in fact, taking preventative measures and experiencing a decline in confirmed cases, the virus poses a significant

risk to the population detained there. Conditions of confinement make true social distancing and hygienic practices difficult or impossible, and absent more robust testing procedures, I cannot conclude with any confidence that the virus has disappeared from the facility.

Heart disease and high blood pressure are risk factors for catching COVID-19 and developing severe illness as a result. *See* Cleveland Clinic, *What Heart Patients Need to Know About COVID-19* (last updated May 6, 2020), https://health.clevelandclinic.org/what-heart-patients-need-to-know-about-covid-19; Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) At Risk for Severe Illness* (last updated May 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html; Mayo Clinic, *COVID-19: Who's at higher risk?* (last updated Apr. 9, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301. Although I do not have a full picture of the severity of Levy's heart attack, the extent of its lasting effect on his heart health, or the permanence of his high blood pressure readings, Levy has produced enough evidence to allow me to conclude that he is at-risk for COVID-19 and ensuing complications. Having seen evidence that Levy suffered a heart attack at a relatively young age, has had at least one abnormal ECG in the meantime, and has had blood pressure readings in the hypertensive range on numerous occasions, I can only conclude that Levy is in less than stellar health, and that, should he contract COVID-19, his case would likely be concerning.

Finally, I give significant weight to the fact that, factoring in good-time credit, Levy has only about eight months remaining to serve on the seventy-month sentence that Judge Weinstein imposed in the Eastern District. *See* Inmate Data 1–4. Levy has spent approximately fifty-one months imprisoned in this case—or approximately 86% of the total amount of time that he is due

11

to actually serve. *See id.* at 4.

Thus, the combination of Levy's medical history, the increased risk that COVID-19 poses to him in confinement because of that history, and the fact that he has served such a significant portion of his total actual term of imprisonment constitutes an extraordinary and compelling reason that would justify Levy's immediate release. *See United States v. Pena*, No. 15-cr-551 (AJN), 2020 WL 2301199, at *4–5 (S.D.N.Y. May 8, 2020) (granting compassionate release because hypertension, hyperlipidemia, and other medical conditions increased vulnerability to COVID-19 and when defendant had served over two-thirds of his sentence); *United States v. Daugerdas*, No. 09cr581, 2020 WL 2097653, at *3–4 (S.D.N.Y. May 1, 2020) (finding extraordinary and compelling reasons because defendant's diabetes, obesity, hypertension, and high cholesterol exposed him to higher risk of severe illness from COVID-19, even when no reported cases of COVID-19 were present at defendant's facility, but ultimately denying compassionate release after applying § 3553(a) factors); *United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at *1–2, *8–9 (S.D.N.Y. Apr. 20, 2020) (granting compassionate release and ordering immediate release from custody when defendant had served just over half of his sentence, had high blood pressure, hypertension, high cholesterol, and sleep apnea, and was detained at facility where COVID-19 was present).

### III. § 3553(a) Factors

The First Step Act requires that the court consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether to grant compassionate release. *See* § 3582(c)(1)(A). Thus, the court must consider what is "sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." § 3553(a). In particular, the court must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

12

   (2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
   (3) the kinds of sentences available;
   (4) [the kinds of sentences and sentencing range provided for in the USSG]
   (5) any pertinent [Sentencing Commission policy statement]
   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
   (7) the need to provide restitution to any victims of the offense.

*Id.*

  Here, under normal circumstances, many of these factors would militate against compassionate release. First, Levy has a significant history of violating supervised release. After his release from prison on the cocaine conspiracy conviction in the Northern District, Levy left the district without permission and failed to report contact with law enforcement officers, leading Judge McAvoy to revoke his supervised release and to impose another prison sentence. *See* J. in Crim. Case, May 9, 2014, N.D.N.Y. Dkt. ECF No. 91. After his subsequent release to supervision, Levy then committed several more violations. *See* Oct. 2018 J., N.D.N.Y. Dkt. ECF No. 121. In fact, a warrant on those violations was outstanding when Levy again committed more violations and was arrested in the instant case. *See* PSR ¶¶ 4–6, 10; Oct. 2018 J. This history strongly suggests that early release to another term of supervision would not deter Levy from recidivating. Second, the nature and circumstances of the felon-in-possession offense were serious. At sentencing, Judge Weinstein found that Levy had the gun within his reach and cocaine on his person just before his arrest. *See* Statement of Reasons 4–5, E.D.N.Y. Dkt. ECF No. 54. Judge Weinstein concluded that "at least one of the purposes of his possession of the firearm was to protect himself and his associates while they distributed narcotics." *Id.* at 5. Indeed, "[a] search of the defendant at the

13

precinct produced a small plastic bag of marijuana and five plastic bags containing 3.32 grams of crack-cocaine." *Id.* at 2 (citing PSR ¶ 7). Still, I have seen no indication that Levy used the gun or threatened anybody with it. Third, Levy has a previous conviction for criminal possession of a loaded firearm, though the offense occurred about fourteen years ago. *See* PSR ¶ 32. Judge Weinstein concluded that "[a] substantial term of incarceration [was] necessary to encourage him—and others like him—to cease relying on firearms for personal security or any other reason." Statement of Reasons 10. On the other side of the ledger, Judge Weinstein outlined at sentencing the defendant's exposure to physical abuse, poverty, drug use, and violence beginning at a young age. *See id.* at 8. Still, Judge Weinstein imposed a seventy-month sentence at the time, and these factors do not change my analysis today.

However, I cannot ignore the present circumstances when determining whether Levy's sentence is "sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." § 3553(a). In light of the grave risk that COVID-19 poses to Levy's health, a term of imprisonment that is just eight months shy of Levy's full, actual term is sufficient. To require him to remain in detention for eight more months, when there is a real chance that he could develop a severe illness because a pandemic has emerged and conditions of confinement place him at risk given his medical history, would be to require a sentence that is greater than necessary to achieve the purposes of sentencing. *See Pena*, 2020 WL 2301199, at *4 (quoting § 3553(a)) ("Due to the COVID-19 pandemic, the 'history and characteristics of the defendant' and the 'need . . . to provide the defendant with needed . . . medical care' now weigh heavily in favor of . . . release."). Thus, under current conditions, the § 3553(a) factors militate in favor of immediate release.

### IV. Sentencing Commission Policy Statement

I must also consider whether release is consistent with the Sentencing Commission's policy

14

statements. *See* § 3582(c)(1)(A)(i). In particular, I must determine that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" USSG § 1B1.13(2). The § 3142(g) factors are largely duplicative of those in § 3553(a). *See* § 3142(g). In addition, they require the court to consider "whether the offense is a crime of violence," "the weight of the evidence against the [inmate]," and "the nature and seriousness of the danger to any person or the community that would be posed by the [inmate's] release." *Id.* § 3142(g)(1)–(4).

Possession of a handgun is dangerous, especially considering Judge Weinstein's conclusion that Levy possessed the gun to use for protection in the course of narcotics distribution. *See* Statement of Reasons 5. Still, I reiterate that Levy did not use or threaten anyone with the gun involved in this offense. While I do not wish to minimize the risk that guns pose to the public safety, I conclude that reducing Levy's sentence so that he serves eight months fewer than planned—after he has already served fifty-one months—does not pose a substantially greater risk to the public than would be present under the *status quo*.

## V. Effect of the Pending Motion in the Northern District

I am satisfied that, considering Judge Weinstein's sentence in isolation, a reduction in Levy's sentence to time served is warranted here—but only if such a reduction will result in his immediate release from prison. It is the very urgency of the current public health crisis that renders Levy's circumstances extraordinary and compelling and that tips the balance of the § 3553(a) factors in favor of release. If I were to reduce Levy's sentence to time served, and should his motion for compassionate release in the Northern District be denied, he would remain imprisoned for twenty-four more months, or approximately 85% of twenty-four months with good-time credit. By the time of the expiration of that sentence, the public health crisis and the risk that it poses to

15

Levy might well have subsided. At such a time, I would not be inclined to conclude that Levy's medical history, without more, constituted an extraordinary and compelling reason for a reduction in his sentence. In addition, under normal circumstances, the § 3553(a) factors and Sentencing Commission Policy Statement would militate in favor of continued detention for the remainder of his prison term. In other words, I find that a reduction in sentence is warranted only if the remedy is Levy's immediate release; until a decision on the Northern District motion for compassionate release has issued, immediate release is not possible.

Therefore, the motion for a reduction in sentence that is before me is stayed pending a decision on the motion for compassionate release in the Northern District. *See* Order, *United States v. Reid*, No. 17-cr-175-CRB-1 (N.D. Cal. Apr. 18, 2020), ECF No. 547 (staying motion for compassionate release pending fulfillment of exhaustion requirement); Order, *United States v. Beck*, No. 1:13-CR-186-6 (M.D.N.C. Mar. 25, 2019), ECF No. 511 (staying resolution of motion for compassionate release pending further review by BOP). Defense counsel is instructed to notify me when a decision on the Northern District motion has issued, at which time I will consider lifting the stay. If I determine that a reduction in sentence to time served is warranted at that time, I will then consider any specific conditions of release, including home confinement and any other additional conditions of supervision.

## CONCLUSION

As set forth in detail above, the instant motion is stayed.

SO ORDERED.

Dated: May 12, 2020 \_\_\_\_\_/s/_____
        Brooklyn, New York         Allyne R. Ross
                                        United States District Judge